**Donald A. Soutar**
**Attorney ID No. 024521999**
**JOHN RUE & ASSOCIATES**
**37 Main Street, Suite 600**
**Sparta, N.J. 07871**
**(862) 283-3155**
**Attorneys for Plaintiff**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| K.K. and A.K. o/b/o Ar.K. | **Civil Action No:** |
| Plaintiff, | |
| vs. | |
| PARSIPPANY-TROY HILLS TOWNSHIP BOARD OF EDUCATION, | |
| Defendant. | **COMPLAINT** |
| Dkt No. Below:  EDS 05268-18 Agency Ref. No.  2018-27744 | |

## PRELIMINARY STATEMENT

This matter arises under the Individuals With Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* (the "IDEA"), and is an appeal of the decision of the Honorable Barry E. Moscowitz, A.L.J. of the New Jersey Office of Administrative Law.  More particularly, plaintiffs K.K. and A.K. ("Plaintiffs") are the parents of Ar.K., who is a minor.  Plaintiffs bring this appeal to reverse A.L.J. Moscowitz's determination that they were not entitled to a psychiatric evaluation at public expense from Ar.K.'s then school district, defendant Parsippany-Troy Hills Township Board of Education ("Defendant" or the "District").

1

## PARTIES

1.  Ar.K. is a minor child with a disability who is a resident of Parsippany, New Jersey.

2.  Ar.K. resides with his father and mother, plaintiffs K.K. and A.K. ("Plaintiffs" or the "Parents") in Parsippany, New Jersey 07054.

3.  Defendant Parsippany-Troy Hills Township Board of Education is a body corporate of the State of New Jersey.

4.  Defendant is charged by the State of New Jersey with the conduct, supervision, and management of public schools for students residing in Parsippany, and is the local educational agency (the "LEA") responsible for providing Ar.K with a free appropriate public education (a "FAPE") in the least restrictive environment ("LRE") pursuant to the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. 1400 *et seq.*. Its administrative offices are located at 292 Parsippany Road, Parsippany, New Jersey 07054, Morris County, State of New Jersey.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 inasmuch as the case arises under the IDEA, and specifically 14 U.S.C. 1415(i)(2)(A), because Plaintiffs are ""aggrieved by the findings and decision made" below, *id*.

6.  Defendant Parsippany-Troy Hills is a resident of the State of New Jersey, and so this Court has personal jurisdiction over it.

7.  Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events and omissions giving rise to the claim occurred in this district.

## BACKGROUND

8.  This action stems from the District's filing of a due process complaint in the New Jersey Office of Administrative Law (the "OAL") against the Parents on March 29, 2018.  A redacted copy of the Due Process Petition is attached hereto as Exhibit A.

9.  A final, appealable decision on the petition was issued by New Jersey Administrative Law Judge Barry E. Moscowitz.   A true and correct copy of that decision is attached hereto as Exhibit B.

10. A one-day trial was conducted on May 1, 2019.  A true and correct copy of the transcript of that hearing is attached hereto as Exhibit C.

11. Plaintiffs now assert their rights, and those of their son, pursuant to federal and state law, as to which they have exhausted their administrative remedies at the Office of Administrative Law.

12. Plaintiff now appeals the decision of the OAL to this Court.

## LEGAL FRAMEWORK

13. The IDEA requires that an LEA, such as Parsippany-Troy Hills, provide eligible children with disabilities with a FAPE in the LRE. 20 U.S.C. § 1412(a)(l)(A).

14. To qualify for IDEA funding, states "shall establish and maintain procedures in accordance with [20 U.S.C. § 1415] to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education." 20 U.S.C. [S] § 1415 (a).

15. Congress placed emphasis upon compliance with procedures to "giv(e) parents and guardians a large measure of participation at every stage of the administrative process" and "the importance Congress attached to these procedural safeguards cannot be gainsaid."

*Hendrick Hudson District Bd. of Ed. v. Rowley*, 458 U.S. 176, 205-206 (1982).

16.     One of the procedural safeguards for parents is the right to an independent educational evaluation (an "IEE") at the District's expense, if they disagree with the initial evaluations performed by the District.  20 U.S.C. 1415(b)(1); 34 C.F.R. 300.502.

17.     Upon request for an IEE, the agency must provide parents information about where an IEE can be obtained and the agency criteria applicable for IEEs.  *Id.*  An LEA must pay for the requested IEE, unless, "without unnecessary delay," the District initiates due process and obtains a judgment, based on its showing that the evaluations it performed were appropriate. *Id.*

18.     Except for certain criteria permitted by federal regulations, "a public agency may not impose conditions or timelines related to obtaining an independent educational evaluation at public expense."  34 C.F.R. 300.502(e)(2).

19.     New Jersey has implemented this federal mandate by the enactment of a 20-day statute of limitations, i.e., a twenty-day period in which a school district must initiate due process. N.J.A.C. 6A:14-2.5(c)(l)(ii).

20.     New Jersey law provides authority for the hearing of matters arising out of the Office of Special Education Programs ("OSEP") of the Department of Education, pursuant to N.J.A.C. 6A:14; N.J.A.C. 1:6A-1.1;34 C.F.R. 300.507.

21.     Final decisions made by the Office of Administrative Law ("OAL") pursuant to due process hearings conducted under the IDEA are appealable by filing a complaint and bringing a civil action in the Law Division of the Superior Court of New Jersey or in a district court of the United States. 20 U.S.C.A. § 1415(i)(2); 34 C.F.R. § 300.516.

## STATEMENT OF FACTS

22. Ar.K. was born in 2007 and at all times relevant to this action has been a resident of Parsippany, New Jersey.

23. In 2009, Ar.K. was classified pursuant to the IDEA under the category of preschool child with a disability.

24. Ar.K. attended Kindergarten outside of Parsippany.

25. Ar.K. returned to Parsippany for first grade where he was classified under the category of Other Health Impaired and attended a Language Learning Disabilities class.

26. At the end of second grade, Ar.K. was re-evaluated and determined ineligible for continued special education and related services.

27. A 504 Accommodation Plan was implemented to provide accommodations in the general education classroom.

28. Ar.K. continued to attend general education classes thereafter with a 504 Plan during the third, fourth, and fifth grade year.

29. Ar.K. is diagnosed as having autism and ADHD, and has a history of seizures and migraines.

**The Parents Request A Re-Evaluation**

30. During Ar.K.'s fifth-grade year, Plaintiffs referred Ar.K. to the Child Study Team ("CST") for evaluations due to emotional concerns, including issues related to Ar.K.'s social development.

31. In June 2017, Plaintiffs shared with the District a private evaluation report by Dr. Robert Troblinger that reviewed the results of Ar.K.'s most recent neuropsychological evaluation conducted in April 2017.

32.  Dr. Troblinger's report confirmed Ar.K.'s diagnoses of autism and ADHD, as well as his history of seizures and migraines, and provided extensive information about Ar.K.'s anxiety and social skills deficits.

33.  Dr. Troblinger concluded that Ar.K.'s diagnosis of Autism Spectrum Disorder along with parental and teacher reports of a severe impact of his behavioral issues on his social functioning clearly demonstrated a need for services to address his social skills deficits - not just through outside services but through the school as well.

34.  On October 2, 2017, the parties met for an evaluation-planning meeting.

35.  Ar.K. was suspected of having a disability that adversely affected his educational performance and was in need of special education and related services.

36.  The CST identified Ar.K.'s areas of suspected disability as Emotionally Disturbed and/or Specific Learning Disorder, but not Autistic or Other Health Impaired.

37.  Despite their identifying Ar.K.'s suspected disability as Emotionally Disturbed, the District proposed to conduct only an educational assessment, a functional psychological assessment, and a social history assessment of Ar.K.

38.  On November 3, 2017, Cristina D'Ambola conducted the educational assessment of Ar.K.

39.  On November 6, 2017, Kim Rom, a school social worker, completed the social history assessment.

40.  On November 15, 2017, Jessica Hensel completed the functional psychological assessment.

41.  On December 18, 2017, the parties met again for an Eligibility Determination meeting.

42.  Prior to the meeting, Plaintiffs again shared Dr. Troblinger's most recent evaluation with the District and gave the CST permission to use it.

43. The District did not review Dr. Troblinger's report at the meeting.

44. Based only on evaluations the school personnel had themselves conducted and interpreted, the District determined that Ar.K. was ineligible to receive special education and related services.

**The Parents' Request For An Independent Educational Evaluation**

45. On February 27, 2018, K.K. sent an email to Kim Rom, the school social worker at Parsippany-Troy Hills, who had conducted the social assessment.  A redacted copy of the email is attached hereto as Exhibit D.

46. In the email, K.K. stated, "I do disagree with some parts of the last evaluations, so I'm asking for an independent. In particular, I'd like a second opinion on his educational, psychological, and psychiatric status."

47. The District responded with a letter, which K.K. interpreted as telling her she was not supposed "to communicate (with) the Board via email."

48. Nonetheless, District personnel, specifically members of the CST, knew K.K.'s February 27, 2018 email was a parental request for an independent educational evaluation ("IEE").

49. On March 19, 2018, K.K. sent a hard copy letter disagreeing with the District's evaluations.

50. On March 29, 2018, thirty (30) calendar days after K.K. initially requested an IEE, the District initiated due process seeking an order denying the request for independent evaluations.

51. On April 12, 2018, the matter was transmitted to the Office of Administrative Law.

52. By letter dated April 23, 2019, Plaintiffs withdrew their request for educational and psychological assessments.

53. The parties appeared for a hearing on May 1, 2019.

54.     The parties submitted their post-hearing briefs on August 2, 2019.

55.     On August 8, 2019, ALJ Moscowitz issued a final, written decision finding that the evaluations conducted by the District were appropriate and denying Plaintiff's request for an independent psychiatric evaluation.

56.     ALJ Moscowitz's decision is arbitrary, capricious and contrary to law because, among other reasons, the Court permitted unreliable "expert" testimony; the Court ruled that certain District policies, which are contrary to federal regulations, nonetheless supported the District's case; improperly shifted the burden upon the Plaintiffs (respondents below) to demonstrate that the evaluations were not appropriate; ignored facts that demonstrated that the District had failed to evaluate in all areas of suspected disability; and found the Plaintiffs had effectively waived their right to a psychiatric evaluation because they had failed to request it at Evaluation Planning Meeting.

57.     The Court, over Plaintiffs' objection, permitted clearly biased witnesses, who were employed by the District and had participated in the challenged evaluation process, to testify as so-called experts.

58.     Moreover, the Court permitted the District's expert to testify beyond the area of their expertise and misconstrued that testimony.

59.     For example, the Court stated that Jessica Hensel, the District's School Psychologist, "asserted that a psychiatric evaluation is not even the right test for A.K. if one wanted to determine emotional disturbance."

60.     Ms. Hensel did not so testify, and she did not have the requisite credentials to testify as to the subject matter of her testimony.

61. ALJ Moscowitz also ignored clear statements of law in crediting this as either fact or opinion.

62. To the contrary, the testimony at the hearing demonstrated that the District had failed to evaluate Ar.K. in all of his areas of suspected disability.

63. The Court erred by applying Board Policy 2460, which provides that the District will not accept email requests from parents regarding special education evaluations, despite the fact that this policy violates 34 C.F.R. § 300.502(e)(2), and the District had waived its policy by responding to the email.

64. New Jersey law provides that school districts in due process matters bear the burden of proof.

65. Nonetheless, the ALJ found that "respondents [the Plaintiffs below] have not shown that the evaluations were inappropriate or that a psychiatric evaluation is either appropriate or necessary in this case."

66. In making that statement, the ALJ further stated that the Plaintiffs "provided no expert testimony whatsoever to counter any of the expert testimony [the District] provided."

67. In making that statement, the ALJ also completely ignored the factual testimony of K.K.

68. ALJ Moscowitz improperly found that a parent seeking an independent evaluation must retain an expert, likely at a cost that exceeds the evaluation sought, to testify at trial.  If this rule were the law, the right to an independent evaluation at public expense would become a legal nullity.

69. ALJ Moscowitz compounded his burden-shifting error when he improperly placed upon the Plaintiffs a duty to request a particular evaluation at an evaluation planning meeting or thereafter be barred from seeking an independent evaluation in that area.  Because a parent

is required to request independent evaluations only when they disagree with a school district's evaluations, it is paradoxical to expect them to make their requests before even seeing the outcome of the school district's evaluations.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the entry of judgment in their favor and against defendant Parsippany-Troy Hills Township Board of Education, granting the following relief:

I.      Reversing the holding below that Defendant's evaluations were appropriate;

II.     Ordering the provision of a psychiatric evaluation at Defendant's expense;

III.    Holding that Plaintiffs are the prevailing parties, and entitled to reasonable attorneys' fees and costs; and

IV.     Such further or other relief as the Court deems just and proper.

**JOHN RUE & ASSOCIATES**
Attorneys for Plaintiffs
K.K. and A.K. o/b/o A.K.

Dated: November 6, 2019          By:      *s/ Donald A. Soutar*
                                              DONALD A. SOUTAR

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

I certify that, to the best of my knowledge, this matter is not the subject of any other action

pending in any court or of any pending arbitration or administrative proceeding.

**JOHN RUE & ASSOCIATES**
Attorneys for Plaintiffs
K.K. and A.K. o/b/o A.K.

Dated:  November 6, 2019                    By:    *s/ Donald A. Soutar*
                                                              DONALD A. SOUTAR

## <u>DESIGNATION OF TRIAL COUNSEL</u>

Donald A. Soutar, of the law firm of John Rue & Associates, is hereby designated as trial counsel.


**JOHN RUE & ASSOCIATES**
Attorneys for Plaintiffs
K.K. and A.K. o/b/o A.K.


Dated:  November 6, 2019                    By:____*s/ Donald A. Soutar*____
                                                                    DONALD A. SOUTAR

# EXHIBIT A

**SCHENCK, PRICE, SMITH & KING, LLP**
220 Park Avenue
P.O. Box 991
Florham Park, New Jersey 07932
(973) 539-1000
Attorneys for Petitioner
Parsippany-Troy Hills Township Board of Education

| | |
|---|---|
| PARSIPPANY-TROY HILLS TOWNSHIP BOARD OF EDUCATION, <br><br>                     Petitioner, <br><br> v. <br><br> K.K. and A.K. o/b/o At.K., <br><br>                     Respondent. | STATE OF NEW JERSEY DEPARTMENT OF EDUCATION OFFICE OF SPECIAL EDUCATION <br><br> **PETITION FOR DUE PROCESS** |

Petitioner, Parsippany-Troy Hills Township Board of Education, (hereinafter referred to as "Petitioner" or "Board"), with its administrative offices located at 292 Parsippany Road, Parsippany, New Jersey 07054, brings this Petition for Due Process to deny Respondent's request for an independent evaluation of At.K.

In support of the requested relief, Petitioner says as follows:

1. The Parsippany-Troy Hills Township Board of Education is a body corporate with the power to institute lawsuits pursuant to N.J.S.A. 18A:11-2.

2. The Board exercises that power herein and institutes this action in accordance with N.J.A.C. 6A:14-2.5(c) against K████ K███ (K.K.) and A████████ K███ ("A.K.") on behalf of their son A████ K███ ("At.K.") (hereinafter collectively referred to as "Respondents"), to deny Respondents' request for an independent evaluation of At.K.

3. At.K. was born on ████████████ and is currently ███ years old. He resides at █████ ████████████████ Parsippany, New Jersey 07054, in an area served by the Parsippany-Troy Hill School District ("District"). Respondents' phone number is █████ ██████████ and K.K.'s email address is ██████████████████ At.K. presently receives accommodations via a 504 Plan.

4. In 2009 At.K. was classified pursuant to the Individuals with Disabilities Education Act ("IDEA") under the category of Preschool Child with a Disability. At.K. attended a class for students with disabilities and received various related services pursuant to an Individualized Education Plan.

{01911945.DOC;1 }

1

5. Upon information and belief, At.K. transferred to another public school district at the age of 3.5 years.

6. At.K. returned to the District for first grade where he was classified under the category of Other Health Impaired and attended a Language Learning Disabilities class.

7. In the second grade, At.K. attended a general education class with in-class resource support for math and study skills.

8. At the end of second grade, At.K. was re-evaluted and found ineligible for continued special education services. A 504 Accommodation Plan was implemented thereafter to provide accommodations in the general education classroom.

9. At.K. continued to attend general education classes thereafter with a 504 Plan during the third, fourth and present fifth grade year.

10. In or around late September 2017, Respondents referred At.K. to the Child Study Team for an evaluation due to emotional concerns including issues related to At.K.'s social development.

11. Prior to the evaluation planning meeting, Respondents provided a copy of a report from Dr. Robert Trobliger, a licensed neuropsychologist who evaluated At.K. in May of 2017.

12. An evaluation planning meeting was held on October 2, 2017 and it was agreed that the CST would take an updated social history, perform an educational assessment and a functional psychological assessment of At.K.

13. The educational assessment was completed on or about November 3, 2017 by Christina D'Ambola, M.A., LDT-C. The evaluation included interviews with At.K. and the classroom teacher and classroom and testing observations. Standardized testing appropriate for students of At.K.'s age was also conducted. The educational assessment was comprehensive and appropriate in all respects.

14. The functional psychological assessment was completed on or about November 15, 2017 by Jessica Hensel, Certified School Psychologist. This evaluation included a review of records and a classroom observation as well as teacher, parent and student rating scales. Standardized testing was not completed during this assessment as At.K. had undergone such testing in May 2017. The psychological assessment was comprehensive and appropriate in all respects.

15. The social history update was completed on November 6, 2017 by Kim N. Rom, School Social Worker. The evaluation included an interview with the parent, student and classroom teacher as well as a review of Dr. Trobliger's report. The updated social history was appropriate in all respects.

16. At.K.'s teacher reported that while At.K. has difficulty making initial connections with peers, he participates in small group discussions and has friends among his peers. At.K. herself reported difficulty making friends however also reported that he has friends he

plays with during recess. He also reported having friends outside of school within his apartment complex.

17. On December 18, 2017, the parties met to consider the results of the evaluations and determined that At.K. was ineligible for special education and related services under the Individuals with Disabilities Education Act.

18. At.K. has continued to participate in the general education classroom with the assistance of a 504 Accommodation Plan. He achieves satisfactory academic standards and scored in the "Exceeding Expectations" on the Language Arts portion and "Met Expectations" on the Math portion of the 4th grade PARCC assessment.

19. On March 19, 2018, the District received correspondence from K.K. indicating that she "disagree[d] with some parts of the last evaluations performed by a child study team" and requesting independent educational, psychological and psychiatric evaluations.

20. It is the Board's position that the evaluations it completed of At.K., coupled with the evaluation performed by Dr. Trobliger, were appropriate in all respects and were used for the purposes designated in N.J.A.C. 6A:14-3.4 and 4.1.

21. Petitioner should be permitted to deny Respondent's requested evaluations because good cause does not exist to order same.

22. The requested psychological evaluation is unnecessary, inappropriate and unwarranted as the information gained from that evaluation would be no different from the information provided as a result of Ms. Hensal's psychological evaluation and Dr. Trobliger's neuropsychological evaluation. The requested psychological evaluation would not provide any new or different information pertinent to At.K.'s eligibility or requisite accommodations under his 504 Accommodation Plan.

23. The requested educational evaluation is unnecessary, inappropriate and unwarranted as the information gained from that evaluation would be no different from the information provided as a result of Ms. D'Ambola's educational evaluation. The requested educational evaluation would not provide any new or different information pertinent to At.K.'s eligibility or requisite accommodations under his 504 Accommodation Plan.

24. The requested psychiatric evaluation is unnecessary, inappropriate, unwarranted and potentially damaging to At.K. There is noting to indicate that At.K. has any emotional disability warranting evaluation.

25. Respondents are free to obtain whatever evaluations they believe necessary for At.K. at their own expense. If they choose to share the reports from any privately obtained evaluation with the District, appropriate consideration will be accorded to those reports. However, the Board should not be required to fund such unnecessary and inappropriate evaluations.

26. Petitioner has provided an appropriate evaluation of At.K. and has acted in accordance with all applicable legal requirements, including but not limited to, compliance with the

{01911945.DOC;1 }

3

IDEA, 20 U.S.C.A. § 1400 et seq.; N.J.S.A. 18A:46-1 et seq.; §504 of the Rehabilitation Act of 1973 and the corresponding Federal and State regulations.

**WHEREFORE,** Petitioner respectfully requests that an order be entered:

1.  Declaring that Petitioner's evaluation of At.K. was appropriate in all respects; and

2.  Denying Respondents' request for independent evaluations of At.K.; and

3.  Granting Petitioner such other and further relief as is deemed appropriate under the circumstances.

> SCHENCK, PRICE, SMITH & KING LLP
> Attorneys for Petitioner,
> Parsippany-Troy Hills Township Board of Education
>
> Katherine A. Gilfillan

Dated: March 29, 2018

**SCHENCK, PRICE, SMITH & KING, LLP**
220 Park Avenue
P.O. Box 991
Florham Park, New Jersey 07932
(973) 539-1000
Attorneys for Petitioner
Parsippany-Troy Hills Township Board of Education

| | |
|---|---|
| PARSIPPANY-TROY HILLS TOWNSHIP BOARD OF EDUCATION, | STATE OF NEW JERSEY DEPARTMENT OF EDUCATION OFFICE OF SPECIAL EDUCATION |
| Petitioner, | |
| v. | **CERTIFICATION OF SERVICE** |
| K.K. and A.K. o/b/o At.K., | |
| Respondent. | |

ROSEMARIE ROBLES, of full age, hereby certifies and says:

I am a legal secretary with the law firm of Schenck, Price, Smith & King, LLP, Attorneys for Petitioner, Parsippany-Troy Hills Board of Education.

I certify that on March 28, 2018, I forwarded an original and one copy of Petitioner's Petition for Due Process was via electronic and first class mail, as follows:

> John Worthington, Director
> Office of Special Education
> New Jersey Department of Education
> P.O. Box 500
> Trenton, New Jersey 08625

I further certify that on March 28, 2018, a copy of Petitioner's Petition for Due Process was sent via electronic and first class mail to:

> A█████ and K█████ K█████
> ███████████
> Parsippany, New Jersey 07054

Rose Marie Robles

**SCHENCK, PRICE, SMITH & KING, LLP**
220 Park Avenue
P.O. Box 991
Florham Park, New Jersey 07932
(973) 539-1000
Attorneys for Petitioner, Board of Education
Parsippany-Troy Hills Township School District

| | |
|---|---|
| BOARD OF EDUCATION PARSIPPANY-TROY HILLS TOWNSHIP SCHOOL DISTRICT, <br><br> Petitioner, <br><br> v. <br><br> K.K. and A.K. o/b/o At.K., <br><br> Respondents. | STATE OF NEW JERSEY DEPARTMENT OF EDUCATION OFFICE OF SPECIAL EDUCATION <br><br> Agency Ref. No. <br><br><br> **CERTIFICATION OF ANTHONY GIORDANO** |

I, Anthony Giordano, hereby certify the following:

1.     I am employed by the Parsippany-Troy Hills Board of Education (hereinafter referred to as "Board" or "District"), in the position of Director of Pupil Personnel Services.

2.     I submit this Certification in support of the Board's request for due process seeking consent for the Child Study Team to complete evaluations of At.K. and to compel the parents' cooperation with same.

3.     I have reviewed the Due Process Petition submitted on behalf of the Board and certify that the facts contained therein are true and accurate to the best of my knowledge.

{01913334.DOC;1 }

1

4.      I also certify that the documents attached to the brief are true and accurate copies of At.K.'s records as they are maintained by the District.

I certify that the foregoing statements made by me are true. I understand that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Anthony Giordano

Dated:  March 29 2018

# EXHIBIT B



*State of New Jersey*
# OFFICE OF ADMINISTRATIVE LAW
33 Washington Street
Newark, NJ 07102
(973) 648-6008

A copy of the administrative law
judge's decision is enclosed.

This decision was mailed to the parties
on _____ AUG – 9 2019 _____



**State of New Jersey**
OFFICE OF ADMINISTRATIVE LAW

**FINAL DECISION**

OAL DKT. NO. EDS 05268-18
AGENCY DKT. NO. 2018-27744

**PARSIPPANY-TROY HILLS TOWNSHIP
BOARD OF EDUCATION,**

Petitioner,

v.

**K.K. AND A.K. ON BEHALF OF A.K.,**

Respondents.

_____

**Alison Kenny**, Esq., for petitioner (Schenck, Price, Smith & King, LLP, attorneys)

**Donald Soutar**, Esq., for respondents (John D. Rue & Associates, LLC, attorneys)

Record Closed: August 2, 2019                    Decided: August 8, 2019

BEFORE **BARRY E. MOSCOWITZ**, ALJ:

## STATEMENT OF THE CASE

On October 2, 2017, petitioner Parsippany-Troy Hills Township Board of Education proposed an educational evaluation, a functional psychological evaluation, and a social history to determine whether respondents' son A.K. was eligible for special education and related services. Respondents K.K. and A.K. neither objected to the evaluations nor provided expert testimony to rebut their appropriateness. Are respondents entitled to an

independent psychiatric evaluation? No. A parent shall be entitled to independent evaluations unless the school district shows that its evaluations were appropriate. N.J.A.C. 6A:14-2.5(c)(1).

## **PROCEDURAL HISTORY**

I.

A.K. is currently ███████ years old. He is in fifth grade and receives accommodations under a 504 Plan. In September 2017, respondents referred A.K. to the child study team for an evaluation due to their concerns about their son's social and emotional development. Before the evaluation-and-planning meeting, respondents provided a copy of a report from Robert Trobliger, a licensed neuropsychologist, who had evaluated A.K. in May 2017, which the child study team reviewed and considered.

On October 2, 2017, the evaluation-and-planning meeting was held, and the parties agreed that the child study team would update the social history and perform both an educational evaluation and a functional psychological evaluation, because respondents suspected that A.K. was emotionally disturbed, which affected his educational performance, and he was in need of special education and related services.

On November 3, 2017, Christina D'Ambola, a learning disabilities teacher consultant (LDTC), performed the educational assessment. The evaluation included an interview with A.K., an interview with his classroom teacher, an observation of A.K. in class, and an observation of A.K. while testing. The testing included standardized testing appropriate for his age.

On November 6, 2017, Kim Rom, a school social worker, completed the social history. This update included interviews with respondents and with the classroom teacher. The update also included a review of Trobliger's report.

On November 15, 2017, Jessica Hensal, a certified school psychologist, performed a functional psychological evaluation, which included a review of records, an observation of A.K. in class, and consideration of both parent and student rating scales.

On December 18, 2017, the parties met to consider the results of these evaluations, and the child study team determined that A.K. was ineligible for special education and related services but could continue to participate in the general-education classroom setting with the accommodations provided in his 504 Plan.

To date, A.K. continues to participate in the general-education classroom setting, has achieved satisfactory academic marks, and has either met or exceeded expectations in the PARCC assessments.

On March 19, 2018, respondents notified petitioner that they disagreed with the evaluations and requested independent educational, psychological, and psychiatric evaluations.

II.

On February 27, 2018, K.K. notified Rom by email that she disagreed with the evaluations and requested independent educational, psychological, and psychiatric evaluations.

Since Rom was not the case manager for A.K., and since petitioner does not accept email for such requests under board policy, Rom advised A.K. to put her request in writing.[1]

---

[1] Board policy explicitly states that the school district does not accept email requests for evaluations:

> The school district will not accept the use of electronic email from the parent(s) to submit requests to a school official regarding referral, identification, evaluation, classification, and the provision of a free, appropriate public education.

[Policy 2460, Special Education, Paragraph 18]

OAL DKT. NO. EDS 05268-18

On March 29, 2018, petitioner filed a petition for a due-process hearing with the Office of Special Education Policy and Procedure (OSEPP), seeking an order denying the request for independent evaluations.

On April 12, 2018, OSEPP transmitted the case to the Office of Administrative Law (OAL) under the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15, and the act establishing the OAL, N.J.S.A. 52:14F-1 to -23, for hearing under the Uniform Administrative Procedure Rules, N.J.A.C. 1:1-1.1 to -21.6, and the Special Education Program, N.J.A.C. 1:6A-1.1 to -18.4.

Currently, respondents only seek a psychiatric evaluation, so whether respondents are entitled to an independent psychiatric evaluation is the only issue to be resolved in this case.

On May 1, 2019, I held the hearing; on August 2, 2019, the parties submitted their post-hearing briefs; and on that date, I closed the record.

## FINDINGS OF FACT

Based on the testimony the parties provided, and my assessment of its credibility, together with the documents the parties submitted, and my assessment of their sufficiency, I **FIND** the following as **FACT**:

I.

Christina D'Ambola is an experienced LDTC and is the case manager for A.K. Among her responsibilities as an LDTC and case manager are writing and updating individualized education programs and performing educational testing for eligibility. Throughout the course of her career, D'Ambola has participated in over 100 procedures and proceedings to determine the eligibility of students for special education and related services. After she testified about her education, training, and experience as a special-education teacher, LDTC, and education evaluator, I accepted her as an expert in these

OAL DKT. NO. EDS 05268-18

three areas.  From her testimony, D'Ambola proved to be both a credible and reliable witness.

On October 2, 2017, the parties met for an evaluation-and-planning meeting, and the child study team proposed that an evaluation was warranted to determine if A.K. had a disability.  It was determined that A.K. was suspected of having a disability that adversely affected his educational performance and was in need of special education and related services.  The area of suspected disability was emotionally disturbed.

At the meeting, respondents shared their concerns and provided the report from Trobliger, who had evaluated A.K. on May 30, 2017.

At the hearing, A.K.'s mother testified that A.K. had a history of seizures and chronic headaches, that A.K. had been diagnosed with attention deficit hyperactivity disorder (ADHD) and autism, and that A.K. had difficulty making friends.  She also explained that A.K. had been picked on at school during his time in-district.  Although K.K. used the term "bullied," the record is devoid of any instances of harassment, intimidation, or bullying.

For the sake of completeness, the record also indicates that A.K. was first found eligible for special education and related services under the category preschool child with a disability, but respondents left the district when A.K. was in kindergarten.  They returned when A.K. was in first grade, when A.K. was again found eligible for special education and related services, but this time under the category other health impaired, and A.K. was placed in a language-learning-disabilities class.

In second grade, A.K. was placed in a general-education class with in-class support for math and study skills.  At the end of second grade, A.K. was reevaluated and found ineligible for special education and related services.  Nevertheless, A.K. was provided with accommodations under a 504 Plan and remained in his general-education class for third, fourth, and fifth grades.

OAL DKT. NO. EDS 05268-18

It was during the start of fifth grade, late September 2017, when respondents referred A.K. to the child study team for evaluation because they had concerns about his social and emotional development.

Meanwhile, respondents had already referred A.K. to Trobliger for a neuropsychological evaluation.

In his report, dated May 30, 2017, Trobliger details his comprehensive evaluation and summarizes that A.K. has an overall level of intellectual functioning in the average range, which is generally appropriate for his age and background and is consistent with prior testing.   The sub-indices of language, visuospatial/visuomotor ability, and information-processing speed were in the average range and suggested no weaknesses. Overall level of reasoning ability and overall level of attention/working memory were in the high-average range, had improved from the average range from two years before, and were of no concern.  Likewise, A.K.'s scores on various tasks assessing his cognitive functioning were in the low-average to high-average range and were consistent with prior testing.   Difficulties in the areas of visuomotor integration and fine motor control, combined with the variable legibility of his handwriting, merely suggested an evaluation to determine if occupational therapy were warranted.   Moreover, scores involving academic-achievement levels for reading, written expression, and mathematics were in the average to very superior range.  As Trobliger wrote, "These scores did not suggest any need for any pull-out class or other special education setting to address academic difficulties."  In fact, Trobliger attributed any difficulties with homework to A.K.'s periodic absences and missing class.

Trobliger continued that he observed only some mild inattentiveness during his evaluation, and considering the information he took from both the parent and the teacher questionnaires, he believed a diagnosis of "other specified ADHD" (a milder version of the original diagnosis of "ADHD—predominantly hyperactive-impulsive presentation") was warranted, which according to Trobliger, suggested improvement in A.K.'s condition. Trobliger specified that A.K.'s tendencies for losing things, leaving his seat, and impulsivity were areas of improvement.  Nevertheless, Trobliger acknowledged that A.K.

still had trouble focusing, attending to details, and managing distractions, suggesting that the accommodations in the 504 Plan remained beneficial.

Similarly, Trobliger wrote that the information he gathered from his interview with A.K., his observations of A.K., his evaluation of A.K., and the information he gathered from both the parent and the teacher questionnaires indicated that the diagnosis of autism also remained appropriate, and he suggested that A.K. would benefit from ongoing therapy to develop his social skills. But Trobliger did not even suggest that this social-skills development take place in or at school. In fact, Trobliger wrote that his primary recommendation, given the reports of teasing or bullying by others, combined with A.K.'s demonstrated interest in forming friendships and awareness of his difficulties in doing so, was therapy outside of school. As such, Trobliger does not write, suggest, indicate, or otherwise imply that A.K. should receive special education and related services under any category, let alone under the category emotionally disturbed.

Regardless, the child study team—from its review of records and from its consultation with respondents—proposed an educational evaluation, a functional psychological evaluation, and a social history to determine whether A.K. was eligible for special education and related services under the category emotionally disturbed. Significantly, respondents did not object to any of these evaluations or assessments and did not suggest or request any others. Hensal would later corroborate this. Accordingly, at the conclusion of the evaluation-and-planning meeting on October 2, 2017, A.K.'s father provided his written consent for these evaluations.

II.

On November 3, 2017, D'Ambola performed the educational evaluation. At the hearing, D'Ambola testified that she evaluated A.K. in the areas of reading, written expression, and mathematics; that A.K. scored in the average to high-average range for all tests; and that A.K. neared the superior range for some subtests. D'Ambola continued that A.K. exhibited a lot of strengths and no weaknesses, comparable to what Trobliger had found. D'Ambola added that A.K. was "a pleasure to work with" and exhibited none

OAL DKT. NO. EDS 05268-18

of the nervousness or anxiousness she would have expected to find in a child who was suspected of being emotionally disturbed.

In her report, D'Ambola provided greater detail.  She wrote that A.K.'s classroom teacher also reported that A.K. is a pleasure to have in class, and that A.K. is an attentive, hardworking, and self-motivated individual, who takes his responsibilities seriously, participates in class, is both cooperative and respectful, and takes suggestions well. A.K.'s teacher continued that A.K. quickly transitions from one task to another and catches on quickly to concepts he misses when he is absent.  Although A.K.'s teacher identified two boys with whom A.K. prefers to work and play, she acknowledged that A.K. prefers to work alone when given the choice.  A.K.'s teacher also acknowledged that A.K. does have difficulty making connections and would benefit from support in this area. Nevertheless, A.K.'s teacher reported that A.K. doesn't give up easily, became more comfortable asking for clarification as the year progressed, is highly organized, and never missed turning in an assignment.  In short, A.K.'s teacher made no mention of anything that would even suggest that A.K. is emotionally disturbed.

D'Ambola reported that A.K. was polite and personable during their encounter and comfortable and at ease during the testing.  In fact, she wrote that A.K. was "exceptionally cooperative."  Moreover, D'Ambola asserted that A.K.'s conversational proficiency is advanced, and that A.K. was attentive to the tasks.  Indeed, D'Ambola wrote that that A.K. liked school—with no mention of teasing or bullying:

> When asked about school, [A.K.] reported that he likes fifth grade and Mrs. Correia is very nice.  He enjoys school and likes recess.  [A.K.'s] favorite subject is Language Arts because he is good at spelling, meanings of words, and he's a good writer.  His favorite story he wrote this year is The Turtle.  He indicated that it was his favorite because it had seven paragraphs.  [A.K.'s] least favorite subject is math because there are lots of steps to solve problems.  When asked about homework, [A.K.] said it was easy and sometimes he needs help with spelling and math.  His favorite books he's read are Wonder and Lego Books.  [A.K.] also enjoys playing with Legos when he is at home.  Extra-curricular activities include Jiu-Jit-Su and Mathnasium.

OAL DKT. NO. EDS 05268-18

[J-2.]

Because A.K.'s test scores were so good, D'Ambola testified that she, and the other members of the child study team, saw no reason for any additional testing whatsoever, and certainly not to determine whether A.K. was emotionally disturbed.

### III.

On November 15, 2017, Hensal performed the psychological evaluation. At the hearing, Hensal testified that in her capacity as a school psychologist, she performs intelligence testing; gauges behavioral measures; attends planning, eligibility, and IEP meetings; and has performed all these functions more than seventy times over her six-year career. Based on her education, training, and experience, Hensal was accepted as an expert in school psychology. Like D'Ambola, Hansel proved to be both a credible and reliable witness.

To start, Hensal corroborated that respondents did not object to any of the proposed evaluations or assessments and did not suggest or request any others. She testified that she did a functional psychological evaluation because emotional disturbance was the concern. She continued that A.K. was reported at risk for some domains, but explained that those results only correlated with what his mother had reported and not what his teacher had reported. As Hensal further explained, it did not manifest in the classroom. In fact, Hensal noted that A.K. did the work he was assigned when she observed him, and that he did it independently, without any negative interactions with his peers.

Regarding the testing, Hensal testified that A.K. did "fine," that her findings correlated with Trobliger's findings, and that no additional testing was necessary. When asked about the need for a psychiatric evaluation, which respondents were requesting, as opposed to a psychological evaluation, which she had performed, Hensal asserted that a psychiatric evaluation is not needed for a determination of emotional disturbance in general, let alone for an assessment of A.K. in particular. In sum, Hensal asserted that

OAL DKT. NO. EDS 05268-18

A.K.'s social and emotional state did not impact his ability to access the education in the classroom.

In her report, Hensal provided background information from her review of records and from her interviews with teachers and respondents, a summary of her classroom observation, and her interpretation of the tests she administered. Hensal specified at the hearing and in her report that A.K.'s teacher and mother were administered the Behavior Assessment System for Children-Third Edition (BASC-3), which is used to measure the behavior and emotions of children and adolescents using three different rating scales. Regarding the Teacher Rating Scale, the results indicate that A.K. is functioning within normal limits across all scales.

Regarding the Parent Rating Scale, however, the results indicate that A.K. is functioning within the clinically significant range in some domains (internalizing problems domain, behavioral symptom index, and adaptive skills domain), the at-risk range in one domain (externalizing problems), the clinically significant range in some subdomains (hyperactivity, anxiety, depression, somatization, atypicality, withdrawal, adaptability, social skills, leadership, daily living skills, and functional communication), and the at-risk range for other domains (attention problems and aggression).

Regarding the Self-Report, the results indicate that A.K. is functioning within the normal range on the internalizing problems, inattention/hyperactivity, and emotional symptom indexes, but in the at-risk range for the personal adjustment and school problems domains, the at-risk range for the attitude to school, anxiety, personal adjustment, and interpersonal relations subdomains, and the clinically significant range for the self-reliance subdomain.

In the Self-Report, A.K. reported that he didn't like school but didn't want to quit it. He also reported that he was often nervous and stressed. He noted that he had difficulty making friends, but didn't think that his classmates didn't like him or that they didn't want to be with him. A.K., however, did not think he could solve his problems on his own. Nevertheless, he reported that he is sometimes a dependable friend, that he is sometimes good at schoolwork, and that he is sometimes good at decision-making.

OAL DKT. NO. EDS 05268-18

From his interview, A.K. stated that his favorite subject is media because he enjoys reading, that his favorite academic subject is language arts because he loves writing stories, but that his least favorite subject is math because he finds it difficult, although he still considered himself good at it.  A.K. acknowledged that he does find socializing and making friends difficult, yet he stated that he still has three friends with whom he is comfortable and whom he could trust.  A.K. even shared that he has friends outside of school who live in his apartment complex.  In fact, A.K. said, in contrast to his Self-Report, that he actually enjoys class, that he actually likes his teacher, and that he actually feels comfortable in the classroom.  Finally, A.K. stated that outside of school he enjoys playing with Legos and on his iPad, that he participates in Jiu-Jitsu, and that he goes to Mathnasium for tutoring.

In her report, Hensal merely recommended that the results be discussed with the child study team and used for appropriate programming.  She did not even hint at the need for any further evaluations, let alone a psychiatric one.  Once again, Hensal opined that while A.K.'s overall self-concept wasn't strong, it did not manifest in the classroom.  In other words, it did not adversely affect his educational performance.

IV.

On December 18, 2017, the parties met for an eligibility-determination meeting.  D'Ambola testified that the child study team reviewed all the evaluations and records in its possession and determined that A.K. was ineligible for special education and related services because he did not have a disability that adversely affected his educational performance.  The notice was admitted into evidence as J-7.  In fact, D'Ambola noted that A.K. continues to work at or above grade level.  Still, the child study team recommended the continuation of the accommodations in the 504 Plan, including the provision of a social-skills group.  It also recommended private counseling outside of school.

Although respondents disagreed with the determination of ineligibility, they had no questions about the evaluations or their recommendations, and they requested no additional evaluations or assessments.

Meanwhile, D'Ambola asserted that the child study team had no concerns whatsoever about its determination of ineligibility, how it was obtained, or whether any additional evaluations or assessments were needed, all points that Hensal echoed during her testimony.

More significantly, respondents provided no expert testimony to discount or challenge the straightforward and unadorned testimony petitioner provided.

Likewise, respondents provided no expert testimony to support their claim that A.K.'s absences from school somehow warranted psychiatric evaluation.

## CONCLUSIONS OF LAW

### I.

As a threshold issue, respondents argue that petitioner filed its petition for a due process hearing out of time because K.K. requested the independent evaluations on February 27, 2016, and petitioner did not file its petition until March 29, 2017, in violation of N.J.A.C. 6A:14-2.5(c)(1)(ii), which states that an independent evaluation must be provided unless the school district initiates a due process hearing "not later than 20 calendar days after receipt of the parental request." In addition, respondents argue that any board policy restricting their ability to request such evaluations is *ultra vires*. In the alternative, respondents argue that petitioner waived this policy because petitioner had previously communicated with respondents by email. At bottom, respondents argue, referencing federal law, 20 U.S.C. 1415(b), and 34 C.F.R. 300.502, that petitioner caused "unnecessary delay" in violation of the spirit of these federal laws.

These arguments, however, are overstated. As petitioner rightly notes, under N.J.A.C. 6A:14-1.2(b)(18), each district board of education must have policies, procedures, and programs approved by the Department of Education to inform parents whether they may use email to submit requests for independent evaluations, and that petitioner has such a policy, which explicitly states that it does not accept email requests

OAL DKT. NO. EDS 05268-18

for evaluations. In addition, petitioner rightly notes that this policy has been approved by the Department of Education, has not been challenged, and has not been overturned. Moreover, petitioner rightly notes that Rom informed K.K. of this policy, and advised her to put her request in writing, which petitioner did not receive until March 19, 2019. As such, the filing on March 29, 2019, is well within the requisite 20 days, and any alleged delay is on the part of respondents, not petitioner. Accordingly, I **CONCLUDE** that petitioner filed its petition timely.

II.

A parent shall be entitled to independent evaluations unless the school district shows that its evaluations were appropriate. N.J.A.C. 6A:14-2.5(c)(1).

In this case, petitioner has shown that its evaluations were appropriate. From the start, the child study team, from its review of records and from its consultation with respondents, proposed an educational evaluation, a functional psychological evaluation, and a social history to determine whether A.K. was eligible for special education and related services under the category emotionally disturbed, and respondents did not object to any of these evaluations or assessments nor request any additional evaluations or assessments, including the psychiatric evaluation they now seek. Moreover, neither the educational evaluation D'Ambola later performed nor the functional psychological evaluation Hensal later performed indicated any emotional disturbance, let alone a need for a psychiatric evaluation, as both D'Ambola and Hensal both testified and wrote.

For example, D'Ambola testified that A.K. exhibited none of the nervousness or anxiousness she would have expected to find in a child who was suspected of being emotionally disturbed. Similarly, Hensal testified that she thought that A.K. had done fine during his testing, that her findings correlated with Trobliger's findings, and that no additional testing was necessary. Indeed, Hensal asserted that a psychiatric evaluation is not even the right test for A.K. if one wanted to determine emotional disturbance. Above all, Hensal opined that A.K.'s social and emotional state, as it was, did not impact his ability to access the education in the classroom.

Meanwhile, respondents have not shown that the evaluations were inappropriate or that a psychiatric evaluation is either appropriate or necessary in this case. To be sure, respondents provided no expert testimony whatsoever to counter any of the expert testimony petitioners provided. Even if petitioner's witnesses are not considered experts, as respondents argue, a preponderance of the evidence still does not exist to show that the evaluations were inappropriate or that a psychiatric evaluation is either appropriate or necessary in this case. As a result, I **CONCLUDE** that petitioner has proven by a preponderance of the evidence that the evaluations in this case were appropriate.

### ORDER

Given my findings of fact and conclusions of law, I **ORDER** that the request for an independent psychiatric evaluation is hereby **DENIED**.

This decision is final pursuant to 20 U.S.C. § 1415(i)(1)(A) and 34 C.F.R. § 300.514 (2019) and is appealable by filing a complaint and bringing a civil action either in the Law Division of the Superior Court of New Jersey or in a district court of the United States. 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516 (2019). If the parent or adult student feels that this decision is not being fully implemented with respect to program or services, this concern should be communicated in writing to the Director, Office of Special Education Programs.

$8|8|19$

DATE

**BARRY E. MOSCOWITZ**, ALJ

Date Received at Agency

$8|8|19$

Date Mailed to Parties:
dr

$8|8|19$

14

OAL DKT. NO. EDS 05268-18

## APPENDIX

### Witnesses

For Petitioner:

Christina D'Ambola

Jessica Hensal


For Respondents:

K.K.


### Documents

Joint:

J-1   Initial Identification and Evaluation Planning—Proposed Action Notice dated October 2, 2017

J-2   Educational Evaluation by D'Ambola dated November 20, 2017

J-3   Social Assessment by Kim Rom, School Social Worker, dated November 20, 2017

J-4   Functional Psychological Evaluation by Hensal dated November 20, 2017

J-5   Neuropsychological Evaluation by Robert Trobliger, Ph.D., dated May 30, 2017

J-6   Email exchange between K.K. and Richard Breiten, School Counselor, Northvail Elementary School, from December 10, 2017, to December 11, 2017

J-7   Initial Eligibility Determination—Not Eligible Notice dated December 18, 2017

J-8   Email exchange from K.K. to Rom dated February 27, 2018

J-9   Letter from K.K. to Anthony Giordano, Executive Director of Pupil Services, dated March 15, 2018


For Petitioner:

P-1   District Policy 2460 Special Education

OAL DKT. NO. EDS 05268-18

For Respondents:

|  | |
|---|---|
| R-1 | Email exchange between K.K. and Richard Breiten from January 25, 2016, to January 26, 2016 |
| R-2 | Identified; not in evidence |
| R-3 | Identified; not in evidence |
| R-4 | Identified; not in evidence |
| R-5 | Identified; not in evidence |
| R-6 | Identified; not in evidence |
| R-7 | Student Daily Attendance Report dated October 9, 2017 |
| R-8 | Email from Rom to Hensal dated November 7, 2017 |

# EXHIBIT C

STATE OF NEW JERSEY
OFFICE OF ADMINISTRATIVE LAW
DOCKET NO. EDS 05268-18

_____
                                :
PARSIPPANY-TROY HILLS           :
BOARD OF ED,                    :
                                :
          Petitioner,           :
                                :            TRANSCRIPT
-vs-                            :                OF
                                :        RECORDED PROCEEDINGS
K.K. and A.K. on behalf         :
of A.K.,                        :
                                :
          Respondent.           :
_____:


                         May 1, 2019


BEFORE:

     THE HONORABLE BARRY E. MOSCOWITZ, A.L.J.


APPEARANCES:


     SCHENCK, PRICE, SMITH & KING
     By: Alison L. Kenny, Esq.
     Attorney(s) for Petitioner


     JOHN RUE & ASSOCIATES
     By: Donald Soutar, Esq.
     Attorney(s) for Respondent


                    Transcriber: Peggy Wasco
                    CRT SUPPORT CORPORATION
                    2082 Highway 35, P.O. Box 785
                    South Amboy, N.J.  08879
                    Phone: (732) 721-4330
                    Fax:   (732) 721-7650

```
                        I N D E X                        2
```

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| CHRISTINA D'AMBOLA | | | | |
| By Ms. Kenny | 5 | | 33 | |
| By Mr. Soutar | | 23 | | |
| | | | | |
| JESSICA HENSAL | | | | |
| By Ms. Kenny | 37 | | 73 | |
| By Mr. Soutar | | 66 | | 77 |
| | | | | |
| K.K. | | | | |
| By Mr. Soutar | 82 | | 104 | |
| By Ms. Kenny | | 104 | | |

E X H I B I T S                            3

| NO. | DESCRIPTION | I.D. | EVID. |
|-----|-------------|------|-------|
| J-1 | Evaluation Plan | 12 | 105 |
| J-2 | Educational Evaluation | 14 | 105 |
| J-3 | Social Evaluation | 54 | 105 |
| J-4 | Functional Psychological Evaluation | 44 | 105 |
| J-5 | Neuropsychological Evaluation | 17 | 105 |
| J-6 | Unnamed Exhibit | | 105 |
| J-7 | Unnamed Exhibit | | 105 |
| J-8 | E-mail from K.K. requesting independent evaluations, 2/27/18 | 99 | 105 |
| J-9 | Letter from K.K. requesting independent evaluations | 101 | 105 |
| J-10 | Unnamed Exhibit | | 105 |
| P-1 | Board policy regarding Special Education | 58 | 59 |
| R-1 | E-mail from K.K. to Mr. Breiten re: A.K.'s issues with large groups | 89 | 103 |
| R-7 | A.K.'s school attendance records, 2016/2017 | 78 | 105 |
| R-8 | E-mail from Ms. Rom to K.K. re: use of report of Dr. Trobliger, 11/7/17 | 99 | 105 |

Colloquy                                    4

1    THE COURT: Today is May 1, 2019.  This is

2    Judge Moscowitz in Hearing Room One.  The case is

3    captioned Parsippany-Troy Hills Township Board of

4    Education against K.K. and A.K. on behalf of A.K.  The

5    OAL docket number is 05268-18 and the agency docket or

6    reference number is 2018-27744.

7         If the parties could please enter their

8    appearances?

9         MS. KENNY: Alison Kenny from Schenck, Price,

10   Smith & King on behalf of the petitioner, Parsippany-

11   Troy Hills Township Board of Education.

12        THE COURT: Good morning.

13        MR. SOUTAR: Good morning, Your Honor.  Donald

14   Soutar from John Rue & Associates on behalf of the

15   parents.

16        THE COURT: Very good.  Good morning.

17        I believe, Ms. Kenny, we're ready for your

18   first witness.

19        MS. KENNY: I'd like to call Cristina

20   D'Ambola.

21        THE COURT: Okay.  If you would, please.  Take

22   your time.  And before you sit down, if you could just

23   raise your right hand so I may swear you in.

24   C R I S T I N A   D A M B O L A, PETITIONER'S WITNESS,

25   SWORN.

Colloquy / D'Ambola - Direct                    5

1          THE COURT: Okay.  Please be seated and then

2     state and spell your name for the record.

3          THE WITNESS: Cristina D'Ambola, C-R-I-S-T-I-

4     N-A, D'Ambola, capital D, apostrophe, capital A-M-B-O-

5     L-A.

6          THE COURT: All right.  Thank you.

7     DIRECT EXAMINATION BY MS. KENNY:

8          Q    Good morning, Ms. D'Ambola.

9     A    Good morning.

10         Q    By whom are you currently employed?

11    A    Parsippany-Troy Hills School District.

12         Q    And can you give us a quick review of your

13    educational background?

14    A    I have a bachelor's degree in elementary education

15    and communications, a certification in special

16    education, a master's in special education, a second

17    master's in administration with a supervisor's

18    certificate, and a certificate in learning disabilities

19    teacher consultant

20         Q    Okay.  And can you describe your professional

21    work experience background?

22    A    I was a special education teacher for 14 years in

23    a previous district, in Montville prior to coming to

24    Parsippany-Troy Hills.  This is my second year as a

25    learning consultant in the Parisppany-Troy Hills School

D'Ambola - Direct                                6

1    District.

2          Q    And other than the certifications that you've

3    just mentioned, do you have any other licenses or

4    certifications?

5    A    No.

6          Q    And I may have already addressed this, but

7    what capacity do you currently serve in the district?

8    A    I am a case manager and I do the educational

9    testing for students.

10         Q    Okay.  And you said you've had the position

11   for two years now?

12   A    This is my second year, yes.

13         Q    And what are your duties?

14   A    I case manage over two buildings in the district.

15   I consult with teachers on strategies for students and

16   what will work best for the classroom.  I observe

17   students and I also test students who potentially could

18   be eligible for special education.  I write their IEPs,

19   I make sure the IEPs are up-to-date and I write the

20   reports, as well, after testing.

21         Q    And what -- what evaluations have you been

22   trained to administer?

23   A    I have been trained to use the WIAT-III, the

24   Woodcock-Johnson IV, and I use the cognitive piece of

25   the Woodcock-Johnson.

D'Ambola - Direct                                7

1          Q    And are those standardized evaluations?

2     A    Yes, they are.

3          Q    Approximately how many educational

4     evaluations have you performed as a learning

5     disabilities teacher consultant?

6     A    I'd say over 30.

7          Q    And have you -- have you sat in on

8     identification meetings?

9     A    Yes.

10         Q    Eligibility meetings?

11    A    Yes.

12         Q    Approximately how many throughout your

13    career?

14    A    Throughout my career, over 100.

15         MS. KENNY: Your Honor, if there's no

16    objections, we would like to offer Ms. D'Ambola as an

17    expert in special education, as a special education

18    teacher, and learning disabilities teacher consultant,

19    educational evaluator.

20         MR. SOUTAR: Your Honor, I would object to the

21    qualifying Ms. D'Ambola as an expert.  Ms. D'Ambola is

22    employed by the petitioner, she receives her paycheck

23    from the petitioner, and I believe she has prepared a

24    report for this case.  She is testifying as to the

25    adequacy of her report.  In these events, she is

1    biased, Your Honor, and she is unable to assist the

2    Court in determining the facts that are at issue in

3    this case, so I would object to qualifying Ms. D'Ambola

4    as an expert.

5              THE COURT: I'm not sure I understand the

6    objection.  You say she doesn't have the training,

7    education, or experience to give an expert opinion or

8    that you think she would give an opinion that might be

9    favorable for the school district?

10             MR. SOUTAR: I think that she will absolutely

11   give an opinion that is favorable for the school

12   district because she is paid by the school district and

13   she's essentially testifying as to the adequacy of her

14   own work.

15             THE COURT: So I'm -- by that statement, I

16   believe that would go to the weight of her testimony,

17   not to her expertise.  So, once again, are you saying

18   that I should not --

19             MR. SOUTAR: You should -- you should not

20   allow her because I do not think that the testimony she

21   will give is reliable to the extent that it would help

22   the Court determine facts at issue.

23             THE COURT: Okay.  There being no real

24   objection to the training, education, and experience --

25   really going to the weight that I give the testimony,

1    the objection is overruled and I will accept Ms.

2    D'Ambola as an expert in special -- as a special

3    education teacher, LDTC, and evaluator.  Was that the

4    third that you had said?

5              MS. KENNY: Right, as part of the LDTC.  Yes,

6    Your Honor.

7              THE COURT: So the special education teacher

8    piece, the LDTC piece, and the evaluator piece, you're

9    saying that's in reference to being an LDTC?

10             MS. KENNY: Yes, Your Honor.

11             THE COURT: Okay.  Very good.  All right.

12   BY MS. KENNY:

13        Q    Ms. D'Ambola, when did you first become

14   familiar with A.K.?

15   A    Last year in -- when we had the ID meeting in

16   October of 2017.

17        Q    Okay.  And did you participate at the

18   identification meeting?

19   A    I did.

20        Q    And are you aware of how he was referred to

21   the child study team?

22   A    Yes.

23        Q    How was he referred?

24   A    He was referred by his parents.  They wanted a

25   child study team evaluation.

D'Ambola - Direct                    10

1      Q    And at that initial identification meeting,

2    was it determined that evaluations would be conducted?

3    A    Yes.

4      Q    And did you participate in the evaluation

5    planning part of the meeting?

6    A    Yes.

7      Q    During -- in advance of the meeting or at the

8    meeting, did you review any records for -- any -- any

9    of A.K.'s records?

10   A    His schoolwork.  I did look at his schoolwork.

11     Q    And was his classroom teacher at the

12   evaluation planning meeting?

13   A    Yes, she was there.

14     Q    Did she share her opinions or observations of

15   A.K. in the classroom during the eval planning meeting?

16   A    Yes, she did.

17     Q    And do you recall any specific discussions

18   about what evaluations were needed for A.K. at that

19   meeting?

20   A    We had decided we would do an educational and we

21   would do -- Mrs. Hudson would do a psychological and

22   then we would do the social history.

23          THE COURT: I'm sorry.  Could you just repeat

24   those three one more time?

25          THE WITNESS: The educational --

D'Ambola - Direct                                    11

1              THE COURT: It was decided that you would

2       perform the --

3              THE WITNESS: I do the educational, yes.

4              THE COURT: You did the educational.  But then

5       --

6              THE WITNESS: Social history --

7              THE COURT: Okay.

8              THE WITNESS: -- was done by our social

9       worker.

10             THE COURT: And then you mentioned another

11      one?

12             THE WITNESS: I think Jessica did the

13      psychological, the WISC-V.

14             THE COURT: Okay.  So your testimony is that

15      it was determined at the meeting to do an educational,

16      a social history, and a psychological and you did the

17      educational and --

18             THE WITNESS: Yes, I did the educational.

19             THE COURT: Okay.  Thank you.

20      BY MS. KENNY:

21          Q    You have two binders in front of you.

22      A    Uh huh.

23          Q    One says "Joint Exhibits."

24      A    Uh huh.

25          Q    You can turn to page one.

D'Ambola - Direct                              12

1    A     Uh huh.

2         Q    Is that the evaluation plan that was

3    developed at the meeting?

4    A     Yes.

5                                    (J-1 Marked for

6                                    Identification)

7         Q    And were there discussions -- were the

8    parents at the meeting?

9    A     Yes.

10        Q    And were there discussions during the meeting

11   as to what evaluations -- I mean, you just told us what

12   evaluations were determined.  Was there discussions at

13   the meeting about which ones would be appropriate, why

14   those would be appropriate?

15   A     Yes.

16        Q    And during the course of the evaluation

17   planning meeting, did anyone disagree with the

18   evaluation plan that was developed?

19   A     No.

20        Q    Did the parents request any additional

21   evaluations during that meeting?

22   A     No.

23        Q    And was there any discussions during the

24   meeting as to A.K.'s areas of suspected disability?

25   A     We talked about possibly maybe specific learning

D'Ambola - Direct                                    13

1    disabilities we were looking for and the parents had

2    expressed that his emotional state, they were concerned

3    with, so we would be looking at emotionally disturbed,

4    which was checked off as well.

5        Q    Is a psychiatric evaluation required to

6    classify a student as emotionally disturbed?

7    A    I believe so.  We didn't do one.  Well, we didn't

8    -- Jessica did a functional.

9        Q    Is a psychiatric evaluation required?  Are

10   you aware?

11   A    I'm not aware of that.

12       Q    Okay.  And you already testified that you --

13   that you conducted an evaluation, so can you describe

14   the process by which you evaluated A.K.?

15   A    I looked at his report card prior to observing him

16   in the classroom.  I looked at more work samples.  I

17   then went in to observe him during a language arts

18   lesson.  He was seated at the front of the room.  He

19   was working independently.  He was asking questions,

20   conversing with his teacher.  He was then working with

21   a group of students and they were working nicely

22   together as a group.

23       Q    Was there any -- any concerns?  Did any

24   concerns pop out at you during the evaluation -- during

25   your observation?  I'm sorry.

D'Ambola - Direct                          14

1    A    No.

2         Q    And then did you also test A.K. as part of

3    your evaluation?

4    A    I did.

5         Q    What test (out of microphone range)?

6    A    I gave him the Woodcock-Johnson IV Test of

7    Achievements.

8         Q    And if you could turn to page two in that

9    same binder, is that a copy of your report?

10   A    Yes.

11                                    (J-2 Marked for

12                                    Identification)

13        Q    And how did you select the Woodcock-Johnson?

14   A    It is a standardized test and it is a national

15   test and is also used by the District.

16        Q    And what -- what does the -- what does the

17   Woodcock-Johnson test?

18   A    It measures abilities in reading, writing, and

19   mathematics.

20        Q    And you said it was a national test.  Is it -

21   - is it recognized in your field as a appropriate

22   measure for students of A.K.'s age at the time?

23   A    Yes.

24        Q    Is it standardized?

25   A    Yes.

D'Ambola - Direct                              15

1      Q    And how did A.K. do on the test.

2      A    A.K. did very well on the test.  He was in the

3      average to high average, almost superior range, on the

4      subtests and clusters.

5      Q    Okay.  And if you would just turn to the last

6      two pages of your report, you report the scores.  You

7      certainly don't need to read them to us.

8      A    Uh huh.

9      Q    Just in reviewing his scores and at the time

10     of the testing, did he -- were there any areas that

11     stood out as a particular strength or weakness for him?

12     A    No weaknesses, a lot of strengths, especially --

13     if I could just -- his writing samples.  He was -- he's

14     a great writer.

15     Q    And (out of microphone range), you were able

16     to obtain valid scores?

17     A    Uh huh.

18     Q    Did you have any concerns about the testing

19     regarding obtaining a valid -- a valid -- the validity

20     of the scores?

21     A    Not at all.

22     Q    Can you just describe the environment in

23     which you tested A.K.?

24     A    I took A.K. into our child study team room.  I

25     interviewed him first, got to know him a little bit,

D'Ambola - Direct                                    16

1    made him comfortable.  I remember he was worried that

2    he was going to miss mathematics, so I said he wouldn't

3    miss it, so I took him in two sessions so that he

4    wouldn't miss certain things, group work, and he

5    wouldn't miss a lot of his classroom work.  He was very

6    comfortable.  I remember when I went back the second

7    time, he jumped right up and came to the door and he

8    was conversational and he really was a pleasure to work

9    with.

10        Q    While you were testing him, how was -- how

11   would you have assessed his demeanor, so to speak?  I

12   mean, your -- one of the identified classification

13   categories was emotionally disturbed, so, you know,

14   were you looking for components of that?

15   A    I was looking to see if I saw if he was anxious or

16   anything or nervous.  He was not.  He was very

17   confident.  He worked very well.  He was diligent.  If

18   he -- he asked questions if needed.  He was not

19   nervous, especially during the timed tasks.  I do

20   enforce -- you know, if the children -- when I give

21   timed tasks, that you have a certain amount of time and

22   you have to do your best, because that's usually -- if

23   there were something, I would see it during one of

24   those.  He did not exhibit any nervousness.  He said,

25   "Okay, I'll do it" and he worked -- he was very

1    persistent with those.

2         Q    And if you could turn to page five of the

3    book, have you seen this report before?

4    A    Yes.

5         Q    Did you review this report as part of the

6    evaluation process and how -- how was this report

7    obtained by the District?

8    A    The parents provided it.

9         Q    Okay.  And just for the record, it's a

10   neuropsychological evaluation by Dr. Trobliger

11   (phonetic), if I'm pronouncing that correctly.

12                                    (J-5 Marked for

13                                    Identification)

14         And did Dr. Trobliger conduct any educational

15   assessments?

16   A    Yes.

17         Q    And did you review the results of those?

18   A    I did.

19         Q    And what educational testing was used by Dr.

20   Trobliger?

21   A    The WIAT-III.

22         Q    And generally speaking, not specific to A.K.,

23   how does the WIAT compare with the Woodcock?

24   A    The WIAT is very challenging.  It's a more

25   challenging test, educationally.  I have given

D'Ambola - Direct                    18

1   components of it so I am familiar with it at that age

2   level.  And A.K., for a very challenging test, he did

3   very, very well.

4        Q    Okay.  And did Dr. Trobliger report the

5   scores anywhere?

6   A    Yes.

7        Q    Can you describe where you are?

8   A    Third to the last page.

9        Q    Okay.  So it looks like a big chart?

10  A    Yes, a chart.  It says, "WIAT-III."

11       Q    Okay.  And how did the results that Dr.

12  Trobliger obtained on the WIAT compare with the results

13  you obtained on -- for A.K. on the Woodcock-Johnson?

14  A    Similar and better.

15       Q    In comparing the scores, did you have any

16  concerns?

17  A    No.

18       Q    Are they -- generally speaking, are they --

19  is the WIAT and the Woodcock-Johnson -- are the scores

20  comparable?  Can --

21  A    Yes.

22       Q    And going back to your evaluation, other than

23  the observation, the interview, and the Woodcock-

24  Johnson, did you use any other assessment tools?

25  A    No.  First, when I was done testing with the

D'Ambola - Direct                    19

1    subtests of the Woodcock, I score them and I see if

2    there are any areas of indication that I should do any

3    further testing.  And because he scored so well, I did

4    not because it would not show up in any other

5    components of testing.

6        Q    Are there times that you, for other students,

7    where you do do additional tests?

8    A    Oh, yes.

9        Q    Generally speaking, no specifics, but what --

10   can you provide me, like, an example?

11           MR. SOUTAR: Objection.  Relevance.

12           THE COURT: Sustained.  Move on.

13           MS. KENNY: Okay.

14   BY MS. KENNY:

15       Q    What conclusions did you reach from your

16   evaluation of A.K.?

17   A    A.K. is performing at grade level or above.  He is

18   very confident with his schoolwork.  He seemed to, in

19   the classroom, get along very well with his peers and

20   he's a very determined worker and he's a very hard

21   worker in school.

22       Q    Was there any peer conflict that came to

23   light during -- during your assessments?

24   A    No.

25       Q    Did any teachers report it to you during the

D'Ambola - Direct                    20

1    assessments?

2    A    No.

3        Q    And did you attend an eligibility meeting for

4    A.K.?

5    A    Yes.

6        Q    And at that meeting, did you -- did the

7    parents attend the meeting as well?

8    A    Yes.

9        Q    Did you review your report -- explain it

10   during the meeting?

11   A    Yes.

12       Q    Did the parents have any questions for you

13   about your report?

14   A    No questions.  They didn't -- you know, they

15   didn't agree with my results, but they did not have any

16   questions.

17       Q    What do you mean by, they didn't agree with

18   your results?

19   A    Well, that he wasn't eligible, so they wanted

20   more, you know, than what we could provide.

21       Q    Did they have any -- was there any concerns

22   expressed specifically to your educational evaluation?

23   A    No.

24       Q    At the eligibility meeting, did the parents

25   request any additional evaluations at that time?

D'Ambola - Direct                    21

1    A    No.

2         Q    And you just said that the team determined

3    that he was not eligible during that eligibility

4    meeting, but did you have any concerns about the

5    assessments that were available?  Did you feel as

6    though -- did you have any concerns about the

7    assessments that were --

8    A    No.

9         Q    -- available to the team at that meeting?

10   A    No.

11        Q    Did you believe that there was any additional

12   information that was necessary to determine his

13   eligibility?

14   A    No.

15        Q    And were you able to determine whether --

16   strike that.  And based on your assessment, would you

17   say that you were able to determine A.K.'s present

18   level -- present level of academic and functional

19   performance --

20   A    Yes.

21        Q    -- at that time?

22   A    Yes.

23        Q    And do -- did you think that there was any

24   additional information necessary to determine whether

25   he had a disability?

D'Ambola - Direct                              22

1    A    No.

2         Q    Do you have any reservations about the

3    appropriateness of the collective initial evaluation as

4    completed by the CST?

5    A    No.

6         Q    In your professional opinion, was your

7    evaluation appropriate for assisting the team in

8    determining his eligibility?

9    A    Yes.

10        Q    Do you have any reservations about the

11   appropriateness of your -- of the evaluation you

12   personally conducted?

13   A    No.

14        Q    Why not?

15   A    It's a standardized test and it's used -- it's

16   used across the nation and it assesses him at his age,

17   and even when you run the numbers at grade level, he is

18   performing at grade level and above.

19        Q    What is your professional -- in your

20   professional opinion, did the evaluation performed

21   comprehensively assess A.K. in all areas of suspected

22   disability?

23   A    Yes.

24        Q    And what is your professional opinion as to

25   whether additional evaluations would be useful for

D'Ambola - Direct / Cross                    23

1    A.K.?

2    A    Based on our evaluations, we didn't feel any

3    addition -- additional evaluations would be useful

4    because he performed very well, he was very confident,

5    and nothing showed in our testing that would warrant

6    anything additional.

7        Q    In your professional opinion, if A.K. had a

8    psychiatric diagnosis, would that impact his -- the

9    eligibility determination that was made?

10   A    No.

11       Q    Why not?

12   A    He's still able to do grade-level and above work.

13   Like, he's still performing very well in school.

14           MS. KENNY: Okay.  No further questions, Your

15   Honor.

16           THE COURT: Okay.  Thank you.

17           Whenever you're ready.

18   CROSS EXAMINATION BY MR. SOUTAR:

19       Q    Good morning.

20   A    Good morning.

21       Q    I want to ask you just a few follow-up

22   questions about your report and about the evaluation

23   process.

24   A    Sure.

25       Q    So you testified earlier that one of A.K.'s

D'Ambola - Cross                                    24

1    areas of suspected disability was that he was

2    emotionally disturbed, correct?

3    A    Yes.

4         Q    And you conducted an educational evaluation,

5    correct?

6    A    Correct.

7         Q    And the educational evaluation does not

8    address whether A.K. was emotionally disturbed, does

9    it?

10   A    No, it's his education.

11        Q    It assesses his academic performance and I

12   don't think -- and you would agree that A.K. is

13   performing well academically, at the level of his

14   peers?

15   A    Yes.

16        Q    The team decided to do three evaluations,

17   correct?

18   A    Yes.

19        Q    Your educational, they did a social history,

20   and they also did a functional psychological

21   evaluation, right?

22   A    Correct.

23        Q    The form that's printed up has written on it,

24   "Psychological Evaluation" has a check box, doesn't it?

25   A    I'd have to --

D'Ambola - Cross                                25

1        Q    You can look at exhibit one, joint exhibit

2    one, page two.

3    A    It says, "Functional -- Psychological Functional"

4    next to it.

5        Q    Right.  And so, "Functional" is written in.

6    A    Yes.

7        Q    Correct?  Okay.  And you didn't conduct the

8    functional evaluation part?

9    A    I did not.

10       Q    And you didn't conduct the social --

11   A    No, I did not.

12       Q    -- history part.  Okay.  Now, your

13   educational evaluation begins with a statement that

14   says that the parents' concerns were with A.K.'s social

15   and emotional well-being, right?

16   A    Correct.

17       Q    And we've already testified that your report

18   really didn't address that -- that area, did it?

19   A    He would have -- sometimes when I -- if I could

20   just say, sometimes when I test, if children are

21   nervous or have anxiety, that would come up during an

22   educational test and that's why, as part of our team

23   testing, we do the educational.  I've had experiences

24   where children have become nervous or they cry during

25   testing and I've had to stop testing.  So that's why we

D'Ambola - Cross                                26

1    do have to do educational, because if there is an

2    emotional component, it does -- most of the time, would

3    show up during an educational because that would impact

4    their education.

5         Q    So if I understand you correctly, the

6    emotional aspect may show up.

7    A    It could, yeah.

8         Q    But it doesn't always show up.

9    A    It's -- I've -- when there is an emotional

10   component, I have seen it, yes.

11        Q    You have seen it.

12   A    I -- I just tested -- re-evaluated a student in

13   fifth grade where I saw high anxiety during my testing.

14        Q    But it doesn't necessarily mean that it

15   always shows up, does it?

16   A    Most of the time, it does.  I have to say, you

17   know, even when I was a special education teacher

18   sitting in on meetings, anxiety, when the student

19   exhibited during testing, it has come up.

20        Q    Now as part of your educational evaluation,

21   you reviewed a statement from A.K.'s teacher.  Is that

22   correct?

23   A    I -- I interviewed the -- I always and I interview

24   the teacher.  I talk to the teacher about the student.

25        Q    So you interviewed Ms. Correra (phonetic)

1     (out of microphone range).

2     A     Yes.

3          Q     During that interview, do you recall Ms.

4     Correra telling you that even when A.K. is absent, he

5     makes up his work quickly?

6     A     Yes.

7          Q     And when you gave your report, your report

8     was in the beginning of November --

9     A     Yes.

10          Q     -- of 2017, correct?

11     A     Yes.

12          Q     And so, school had been in session for, what,

13     six, seven weeks by that point?

14     A     Yes.

15          Q     Did you think it was unusual that that early

16     in the school year, Ms. Correra was mentioning

17     absences?

18     A     No, that didn't occur to me.

19          Q     Did you check at all whether A.K. -- A.K.'s

20     attendance had been regular by that point?

21     A     No.

22          Q     Would that impact your decisions one way or

23     another on your evaluation?

24     A     No.

25          Q     Even with respect to the side issue of your

1    evaluating whether somebody is emotionally disturbed?

2    A    He would -- no, he would -- usually with the

3    educational testing, he was -- he didn't -- even when I

4    talked with him, he didn't indicate that he -- you

5    know, anything with being absent or school or anything

6    that he didn't like or -- you know, because we do talk

7    about school and what he likes and doesn't like and

8    things like that.

9        Q    So you didn't investigate whether absence was

10   an issue with A.K. at that point?

11   A    No, I looked at the -- I always look at the report

12   card, you know, from the previous year, and again, like

13   you said, school had, you know, just begun --

14       Q    Uh huh.

15   A    -- so he didn't have a report card at that point.

16   It wasn't coming until December.

17       Q    Do you recall if you looked at his prior

18   year's report card?

19   A    Yes, I look -- I look at it mostly for grades and

20   work habits and things like that.

21       Q    Did you check his absence on his report card?

22   A    I don't recall.

23       Q    In your experience, what would -- what would

24   be an excessive absence for a student in the fourth or

25   fifth grade?

D'Ambola - Cross                              29

1           MS. KENNY: Objection, Your Honor.  I think

2      this goes beyond the scope of what this witness --

3           THE COURT: Well --

4           MS. KENNY: -- really even has knowledge of.

5      I mean --

6           THE COURT: We can go beyond the scope.  That

7      part -- that part is okay, so overruled.

8           THE COURT: You can answer.

9      BY MR. SOUTAR:

10          Q    You can answer the question.

11          A    Okay.  I guess (out of microphone range) excessive

12     would be being absent three to four times every week.

13     I mean, that's excessive.

14          Q    And -- and so, it's your testimony that

15     somebody could be absent twice a week, every week of

16     school, and that would not be excessive?

17          A    If it's impacting their education, then yes.

18          Q    Would it surprise you to know that, in fourth

19     grade, A.K. was absent 28 times during the year?

20          A    That's a lot.  You know, that's --

21          Q    And -- now, you also testified that you

22     reviewed Dr. Trobliger's report before doing yours and

23     I think you testified that you looked at it in enough

24     detail to be able to compare the WIAT scores with the

25     Woodcock-Johnson scores.  (Out of microphone range), so

1    you also testified that these are standardized tests.

2    A    Yes.

3         Q    And do I understand correctly that

4    standardized tests means that they are objective?

5    A    Yes.

6         Q    And so, the student takes the test and they

7    are compared among a large range of students and

8    there's really no subjective element to it.  You look

9    at the scores and that tells you your answers.  Is that

10   correct?

11   A    It's comparable to their class performance as

12   well.

13        Q    So do you figure the class performance into

14   the scores on the WIAT or the Woodcock-Johnson?

15   A    That, we don't.  But when we -- looking to

16   classify a student, if their class performance

17   academically is not up to par, it will show up in our

18   testing -- in my testing, at least, it will.  There

19   will be an impact.

20        Q    Now when you were looking at Dr. Trobliger's

21   report just a few minutes ago -- this is exhibit five -

22   - you noted at the end that there were several scores

23   listed in the table.

24   A    Uh huh.

25        Q    I think you testified this was the last three

1    pages.

2    A    Yes.

3         Q    Now if -- if you turn to the second page from

4    the end -- these are on the table still -- did you

5    notice when you reviewed Dr. Trobliger's report -- this

6    is five lines from the bottom -- that A.K.'s scores on

7    a different test show that he was in a clinically

8    significant risk for anxious and depressed conduct?

9    A    Yes, I did see that.

10        Q    Okay.  Did you --

11   A    And I looked for that in my testing and I did not

12   -- he did not -- it wasn't indicated when he was

13   testing with me.

14        Q    Okay.  But you did notice that.

15   A    Uh huh.

16        Q    And did you also notice that he was also in

17   the clinically significant range for withdrawn and

18   depressed?

19   A    Yes.

20        Q    And the same thing for somatic complaints.

21   A    Yes.

22        Q    And social problems.

23   A    Yes.

24        Q    And you also testified earlier, I believe,

25   that the parents didn't agree with the results.  Did

D'Ambola - Cross                                  32

1    the school, at that point, offer to provide any

2    additional testing?

3    A    No, there wasn't any additional testing.  We

4    offered a 504 plan --

5        Q    Okay.

6    A    -- which he had previously.

7        Q    Are you aware that at some -- sometime later,

8    that the parents requested an independent educational

9    evaluation in the area of a psychiatric report?

10   A    Yes.

11       Q    And how did you become aware of that?

12   A    They had -- it was just kind of like mentioned

13   among.  It wasn't -- I didn't know who or when it was,

14   you know, going to be conducted or if it was going to

15   be conducted.

16       Q    Okay.  So you -- you basically had nothing to

17   do with the request for a psychiatric independent

18   evaluation?

19   A    No, no.

20           MR. SOUTAR: Okay.  Nothing further, Your

21   Honor.

22           THE COURT: Okay.

23           Anything else?

24           MS. KENNY: Just a few quick redirects, Your

25   Honor.

D'Ambola - Redirect                    33

1          THE COURT: Go ahead.

2     REDIRECT EXAMINATION BY MS. KENNY:

3          Q    If you could turn to page five -- I'm sorry -

4     - tab five.  During cross examination, you were

5     directed to the -- those clinically -- those scores

6     that are listed as "clinically significant."  And if

7     you look at the bottom of -- I guess it's the third to

8     last page, they're identified as "CDCL."  Is that

9     correct?

10    A    Second to last or third?

11         THE COURT: Third to last, at the bottom.

12         MS. KENNY: Third to the last.

13         MR. SOUTAR: Third to the last.  Sorry.

14    BY MS. KENNY:

15         Q    So there's --

16         THE COURT: One, two, three, four, five lines

17    up.

18    BY MS. KENNY:

19         Q    -- there's the WIAT that you testified and

20    then there's kind of that big black line.

21    A    Hold on.  I'm on the wrong page.  Sorry.

22         Q    Should have numbered them.

23    A    Okay.  So the WIAT?  Okay, down here.  Yes, I see

24    it.  Okay.

25         Q    Okay.

D'Ambola - Redirect                                34

1    A    Got it.

2         Q    Are you -- are you familiar with the CDCL?

3    A    No.

4         Q    Okay.  But if I could direct you to page --

5    go back to the beginning.

6    A    Hold on.  This is coming apart.  Okay.  Got it.

7         Q    If you could -- sorry -- if you could then

8    turn seven pages in, the top of the page will say "Self

9    Report Measures."

10   A    Yes.

11        Q    And then the next paragraph down, do you see

12   -- do you see the letters "CDCL" there?

13   A    Hold on.

14        Q    Like kind of a third of the way down the

15   page, the very end, in parentheses.

16   A    Still looking.

17        Q    Much higher.

18   A    Much higher.  Yes.

19        Q    Okay.  And although you just said that you're

20   not familiar, based on this sentence, is the CDCL

21   administered directly to A.K.?

22   A    From us or --

23        Q    No, when -- when it's given, who -- based on

24   this sentence, who -- who conducts -- who completed the

25   information that resulted in the CDCL?

D'Ambola - Redirect / Colloquy                    35

1    A    This doctor did.

2         Q    The doctor administered it, but who was the

3    informant?

4    A    Can you rephrase that?

5         Q    If you read -- can you read that sentence?

6    It says, "Observer report measures."  You don't need to

7    read it out loud.

8    A    Okay.  His Mom.

9         Q    So -- so based on this information, did --

10   was A.K. responsible for providing the responses on the

11   CDCL that resulted in the clinical (out of microphone

12   range)?

13                  MR. SOUTAR: Objection.

14                  THE WITNESS: No.

15                  MR. SOUTAR: I think that this witness is

16   being asked to testify beyond the scope of her

17   expertise.

18                  THE COURT: Sustained.  The witness testified

19   she doesn't know what the CDCL is.  I -- I see, though,

20   Ms. Kenny, what you're driving at.  It's in the report.

21                  MS. KENNY: Okay.  No further questions then,

22   Your Honor.

23                  THE COURT: Okay.  Any follow-up?

24                  MR. SOUTAR: No, Your Honor.

25                  THE COURT: All right.  Thank you very much.

Colloquy                                        36

1              THE WITNESS: Thank you.

2              THE COURT: You may step down.

3              Do you want to take a break?  Witnesses here?

4              MS. KENNY: Yes, our next witness is not quite

5       here yet, Your Honor.

6              THE COURT: No problem.  It's a credit to both

7       of you for being so efficient, so that's a good thing.

8       All right.  So let's take a break.  We'll go off the

9       record.

10                         (BRIEF RECESS)

11             THE COURT: All right.  We're back on the

12      record after a short break and I believe we're ready

13      for your next witness.

14             MS. KENNY: Yes, Your Honor.  I'd like to call

15      Jessica Hensal to the stand.

16             THE COURT: Okay.  If you would please come

17      forward?  And before you sit down, if you could just

18      raise your right hand so I may swear you in.

19      J E S S I C A   H E N S A L, PETITIONER'S WITNESS,

20      SWORN.

21             THE COURT: Please be seated and then state

22      and spell your name for the record.

23             THE WITNESS: Jessica Hensal, J-E-S-S-I-C-A,

24      H-E-N-S-A-L.

25             THE COURT: Thank you.

1    DIRECT EXAMINATION BY MS. KENNY:

2         Q    Good morning, Ms. Hensal.  By whom are you

3    currently employed?

4    A    Parsippany-Troy Hills.

5         Q    And what is your educational background?

6    A    I graduated college with a B.S. in psychology from

7    James Madison University, I received my master's in

8    child and adolescent clinical psychology from Montclair

9    State, and then I have a certificate in school

10   psychology.

11        Q    Okay.  And do you hold any other licenses or

12   certifications?

13   A    Just the school psychology.

14        Q    Okay.  And can you describe your professional

15   work experience?

16   A    I was hired in Parsippany in September 2012 and

17   that's my first.

18        Q    Okay.  And what's your -- what's your title

19   of the job?

20   A    School psychologist.

21        Q    Okay.  And is that the only position that

22   you've held throughout your time?

23   A    Yes.

24        Q    And how long have you held this position?

25   Oh, you just said that -- sorry.  I'll strike that.

1      What are your duties as a school psychologist in

2      Parsippany?

3      A    I evaluate children for special education.  I also

4      case manage special education students.  I do

5      counseling.  All of that.

6           Q    Is the counseling just for special education

7      students?

8      A    Yes.

9           Q    And have you been trained to administer any

10     evaluations?

11     A    Yes, I have.

12          Q    What evals?

13     A    I do the intelligence testing on the team and then

14     I also give behavioral measures.

15          Q    Okay.  Can you -- specifically what -- what

16     tests have you been trained on?

17     A    Sure.  The WISC, the Wechsler Intelligence Scale

18     for Children -- that one -- and then I've done the

19     Stanford-Binet.

20          Q    And as -- approximately how many

21     psychological evaluations have you performed as a

22     school psychologist?

23     A    Oh, many.  Over 70, I would say.

24          Q    And in your role as a school psychologist, do

25     you sit in -- sit at -- participate in identification

1    meetings?

2    A    Yes, I do.

3         Q    Eligibility meetings?

4    A    Yes, I do.

5         Q    IEP meetings?

6    A    Yes.

7         Q    Approximately how many throughout your

8    career?

9    A    At least 10 a year, I would say, so 70.

10        Q    Are you required to have any continuing

11   education classes to maintain your certification as a

12   school psychologist?

13   A    No, however, we have Professional Development with

14   the District.

15        MS. KENNY: Your Honor, if there's no

16   objection, I would like to offer Ms. Hensal as an

17   expert in school psychology.

18        MR. SOUTAR: Your Honor, I'd just like to

19   renew my objection as to the bias of the witness.  I'm

20   happy to repeat my arguments.

21        THE COURT: No, that's okay.  They're on

22   there.  Again, it goes to the weight, not to the

23   expertise, and the objection is overruled and we will

24   have Ms. Hensal accepted as an expert in school

25   psychology.

1    BY MS. KENNY:

2         Q    Ms. Hensal, when did you first become

3    familiar with A.K.?

4    A    The parents had written a letter for an evaluation

5    and that's when I became familiar.

6         Q    Do you know the approximate time frame for

7    that?

8    A    No, I'm not (sic).  I don't remember when the

9    letter was written.

10        Q    And in -- for -- what's your role for -- for

11   A.K.?  Were you -- did you have any responsibility to

12   him?

13   A    I was the case manager, so once I received the

14   letter, then I sent -- we selected a date and I sent

15   out the letter to the parent.

16        Q    Okay.  And the letter was -- selected a date

17   and a letter regarding what?

18   A    Oh, I'm sorry.  For -- invitation to the

19   identification meeting.

20        Q    Okay.  And did you participate in that -- in

21   that identification meeting?

22   A    Yes, I did.

23        Q    And the parents were also in attendance?

24   A    Yes.

25        Q    I won't go through the whole thing.  There's

Hensal - Direct                              41

1    -- I'm sorry -- in front of you, there's two binders.

2    If you could open the one that says "Joint," open to

3    tab one, the last page.  Is that -- sorry -- is that a

4    sign-in sheet from the -- from that initial meeting?

5    A    Yes.

6         Q    And does that accurately reflect the

7    participants at the meeting?

8    A    Yes, it does.

9         Q    And as the case manager, what was discussed

10   at that initial identification meeting?

11   A    Because the parents wrote a letter, we asked the

12   parents what their concerns were.  They had social

13   emotional concerns for A.K. and we decided, from that,

14   to go ahead with testing.

15        Q    Did the -- based on this, the general

16   education teacher was in attendance.

17   A    Yes.

18        Q    Did she share in the parents' concerns

19   regarding the social emotional issues that they raised

20   at the meeting?

21   A    No, she did not.

22        Q    Did she express that at the meeting?

23   A    Yes, from my -- from what I remember, yes, she

24   did.

25        Q    Do you remember anything specific about what

1    the classroom teacher might have said about him?

2    A    She said that he was an excellent student.  She

3    didn't see any emotional concerns in the classroom.  I

4    remember her saying that sometimes he's -- he doesn't

5    want to work with other children but that he will work

6    with them with her -- with her support.

7         Q    Did she comment as to his success at working,

8    you know, especially in situations where he did not

9    want to?

10   A    Yeah, academically, she said he was okay.

11        Q    And did you review any records at the

12   evaluation planning meeting?

13   A    Yes.  The parents had done an independent

14   neuropsychiatric evaluation.

15        Q    Okay.  If you turn to page -- I'm sorry --

16   tab five.

17   A    Yup.

18        Q    Is that the report?

19   A    Yes.

20        Q    And in advance of the meeting, did you

21   conduct any observations of A.K. in the school?

22   A    Before the meeting?

23        Q    Yes.

24   A    No.

25        Q    Do you -- do you recall any discussions about

Hensal - Direct                                    43

1   what evaluations were needed for A.K. at that meeting?

2   A    Yes.  The intelligence scale was already done, as

3   well as the WIAT, which is an educational evaluation,

4   so that's -- we decided not to do those.  I did more of

5   a functional to see, because this was done the year

6   prior, to see what the teacher reported.

7            THE COURT: When you say "this was done the

8   year prior," you're referring to?

9            THE WITNESS: This was done when he was in

10   fourth grade.

11            THE COURT: What was?

12            THE WITNESS: Oh, this, the

13   neuropsychological.

14            THE COURT: Okay.  Thanks.

15            THE WITNESS: Sorry.

16            THE COURT: No, that's okay.  Just wanted the

17   record to be clear.

18            THE WITNESS: Yeah.

19   BY MS. KENNY:

20       Q    Is it typical to only do a functional

21   psychological assessment?

22   A    No, typically, we don't have parents already do a

23   -- have a private eval.

24       Q    And you reviewed this evaluation prior to

25   determining that you would only conduct a functional --

1    A    Yes.

2         Q    -- psychological?  Did you have concerns

3    about any of the psychological testing that was

4    reported in the neuropsych?

5    A    No.

6         Q    Was -- was there any other evaluations that

7    were -- possible evaluations that were discussed at the

8    evaluation planning meeting that the team determined --

9    decided not to conduct?

10   A    Not that I recall, no.

11        Q    Did the parent request any specific

12   evaluation during that meeting?

13   A    No.

14        Q    What area of suspected disability did -- was

15   identified for A.K.?

16   A    Emotionally disturbed.

17        Q    And is a psychiatric evaluation required to

18   classify a student as emotionally disturbed?

19   A    No.

20        Q    And if you can turn to -- I'm sorry.  And

21   what -- strike that.  If you turn to page -- tab four.

22   A    Okay, tab four.

23        Q    Can you identify that document?

24   A    That's my functional psychological evaluation.

25                                     (J-4 Marked for

1              Identification)

2        Q    Okay.  So for -- for the functional

3   psychological evaluation, can you describe the process

4   that you used to evaluate A.K.?

5   A    Sure.  I met with A.K.  I interviewed him.  I gave

6   him a behavior assessment scale.  And then I also spoke

7   with the teacher and I observed him in the classroom.

8   I gave the teacher a scale and then I also talked to

9   Ms. K. and I gave her a scale.

10       Q    And can you describe what this scale is?

11  A    Oh, sure.  It's a behavior assessment scale for

12  children.  It's a very comprehensive scale and it looks

13  at all different areas such as attention,

14  hyperactivity, social skills, study skills.

15       Q    Why did you select that measurement?

16  A    I like it because it's more comprehensive.  In the

17  functional neuropsychological, they already had done

18  the Beck Youth Inventory and they did the Conner, so I

19  wasn't able to do those again.

20       Q    Were those evaluations, the Beck Youth

21  Inventory or the Conner's, are those evaluations that

22  you would have -- may have wanted to conduct with A.K.

23  had they not already been done?

24  A    I use the Beck, but I like the BASC better because

25  it does show a more comprehensive profile.

Hensal - Direct                          46

1       Q    You like the BASC better than what?

2       A    The Beck -- sorry -- the Beck.  I don't normally

3       use the Conner's.

4       Q    Okay.  And can you kind of just explain the

5       differences between those three measures or what -- or

6       describe each one?  What are -- what's the same, what's

7       different?

8       A    So the Beck Youth Inventory, it looks at anger,

9       anxiety, depression, self-concept.  I -- because

10      another portion of the parents' concern was social

11      skills and peer relationships, that's why I chose the

12      BASC.  That has that component to it.  The Conner's --

13             THE COURT: I'm sorry.  Which component?

14             THE WITNESS: Social skills.  The -- the

15      Conner's is more for attention, typically.

16      BY MS. KENNY:

17      Q    And you don't need to read anything from a

18      report.  You have in here, kind of, the summaries.  But

19      generally speaking, you said that you administered the

20      BASC to A.K.  Can you -- can you just describe first

21      how -- when you call it a scale, kind of just explain

22      how it's administered a little bit?

23      A    Sure.  It's standardized scale, so I give it to

24      him, too.  He looks at -- you know, he answered the

25      questions independently himself.  He has to rate them.

Hensal - Direct                                47

1      Part of it is true/false and part of it is never,

2      sometimes, often, or always that he has to respond to

3      items.

4          Q    And can you give us an example?  It doesn't

5      have to be specific wording, but just the type of

6      questions that are on the -- that are on the BASC.

7      A    Like "I try my best in school," "I work well with

8      other children" -- that sort of thing.

9          Q    And how did, I guess, A.K. respond or how was

10     his results on his self-administered?

11     A    Sure.  So the biggest -- the area that was in the

12     at-risk range, if I remember correctly, for A.K. was --

13     was his self -- I'm sorry -- his self-reliance was in

14     the clinically significant range.  So those are such

15     things as, like, his self -- really, his self-concept.

16     Like "I can do work without needing -- ," "I get

17     nervous when things don't go the right way" or -- there

18     was another one that I wrote in here.  Oh, I'm sorry.

19     "If I have a problem, I can usually work it out" or "I

20     can solve difficult problems by myself."  That's what's

21     on the self-reliance scale.

22         Q    And he did poorly, so to speak, on that?

23     A    Well, he reported that he couldn't.

24         Q    Okay.  And did his report correlate with the

25     report of both the parent and the teacher?

1   A    The parent, yes; the teacher, no.  There was a

2   difference there.

3        Q    So, collectively with the BASC, was there --

4   was there areas of strengths and weaknesses that -- I

5   don't know -- that were identified or --

6   A    Not really.  It's not really how it --

7        Q    So how -- how -- how did you interpret the

8   results?

9   A    So, from my understanding, I think he had -- what

10  I saw was that he has more -- his overall self-concept

11  isn't strong, but it was -- that was different from

12  what was being seen in the classroom.

13       Q    And how was A.K.'s demeanor during this

14  assessment?

15  A    It was fine.

16       Q    And did you conduct a classroom observation?

17  A    I did.

18       Q    Can you just -- you don't need to read us,

19  but anything that you can kind of enhance from what was

20  -- what you observed in the classroom?

21  A    He was attentive and focused.  He -- well, he

22  didn't participate at first.  He did in the end.  I

23  don't believe there was any group work that I

24  witnessed, but he did do the work and he did it

25  independently.

Hensal - Direct                                    49

1      Q    And did you observe any positive or negative

2      interactions with peers during your observation?

3      A    None, no.

4      Q    And you also relied on results that were

5      reported by Dr. Trobliger in the neuropsychological.

6      A    Yes.

7      Q    Is that correct?  What results did you rely

8      on?

9      A    I looked at the WISC, the intelligence scale, and

10     I also looked at -- well, and the Conner's and the Beck

11     Youth Inventory.

12     Q    And how did the results on the neuro-

13     psychological evaluation compare with the results that

14     you received -- that you -- how did they compare with

15     the BASC results?

16     A    Similar in that with the Beck Youth Inventories,

17     his self-concept was elevated.  What tab is that?  I'm

18     sorry.  I just want to make sure I have the right

19     wordage.

20     Q    If you -- it's tab five.

21     A    Five.  I think it was -- where does he say it?

22     "His self-concept much lower than average."  That's

23     what they say.

24              THE COURT: Where are you looking?

25              THE WITNESS: I'm looking at --

1           THE COURT: Tab five.  Which page?

2           THE WITNESS: -- tab five on -- they don't

3      have page numbers, unfortunately.  It's the --

4           MS. KENNY: Is it -- if you go by the chart,

5      what number?  What page of chart?

6           THE WITNESS: Three.  From the back -- I'm

7      sorry -- three from the back.  At the top, it says,

8      "Generation -- "

9           THE COURT: "Letter"?

10          THE WITNESS: " -- Letter" -- yes.

11          THE COURT: Okay.  And you're looking at?

12          THE WITNESS: At the BYI and the -- the BYI-2,

13     and then, underneath it, it says, "BSCI."  That's the

14     self-concept scale.

15          THE COURT: Okay.  Thank you.

16     BY MS. KENNY:

17      Q    So that correlated with the results that you

18     received on the Beck?

19      A    I kind of found that they matched in that respect.

20      Q    And how is the Beck Youth Inventory

21     administered?

22      A    The same way the BASC is.  You typically hand it

23     to a child and then they fill it out themselves.

24      Q    Okay.  Is there any teacher component to the

25      --

Hensal - Direct                                    51

1    A    Not that I'm aware of, no.

2         Q    Okay.  And is there any parent reporting?

3    A    Again, not that I'm aware of.  I only use the

4    student scale.

5         Q    Okay.  And you said that you also reviewed

6    the results of the Conner's.  Can the -- can the

7    Conner's be compared to the BASC?

8    A    For attention purposes, yes.

9         Q    And how did the results compare?

10   A    Attention was in the at-risk range for my -- I'm

11   sorry -- on the BASC that I conducted and the same

12   thing here.  It was -- it is a concern -- attention.

13        Q    And did the -- is -- did you speak with

14   A.K.'s classroom teacher?

15   A    Yes.

16        Q    And did she report that he had difficulty

17   attending in the classroom?

18   A    Not really.  I mean, he did -- he was able to

19   maintain his attention with minimal support.

20        Q    Was there anything specific regarding the

21   neuropsychological testing that you were concerned

22   about?

23   A    No.

24        Q    And how did -- how did A.K. perform on the

25   WISC?

Hensal - Direct                                    52

1    A    He scored -- he was in the average range.

2         Q    Did you have any concerns about the scores

3    reported on the WISC?

4    A    No, I did not.

5         Q    Are there -- are there any additional

6    assessments that you think you should -- you should

7    have conducted as part of your psychological

8    evaluation?

9    A    No.

10        Q    And the assessment, the BASC that you used,

11   is that recognized within your field?

12   A    Yes.

13        Q    And the results, the test results that you

14   relied on for the neuropsych -- so the WISC, the Beck

15   Youth Inventory, the Conner's -- are those recognized

16   within --

17   A    Yes.

18        Q    Did you review any additional records as part

19   of your assessment?

20   A    No, not for this.

21        Q    So what conclusions did you reach from, you

22   know, your functional evaluation of A.K. in conjunction

23   with the neuropsychological evaluation that was relied

24   on?

25   A    In my opinion, I didn't think that it was

Hensal - Direct                            53

1   impacting his education in the classroom.

2           Q    When you say "it" --

3   A    I'm sorry.  His emotional -- social emotional

4   state was not impacting his ability to perform in the

5   classroom.

6           Q    And did you attend the eligibility meeting

7   for A.K.?

8   A    I did.

9           Q    And did you review your report at the

10  meeting?

11  A    Yes.

12          Q    Was the neuropsychological evaluation

13  reviewed at all in the meeting?

14  A    I don't recall.  I don't think so.

15          Q    At the meeting, did the parents have any

16  questions for you regarding the psychological

17  evaluation that you conducted?

18  A    No.

19          Q    At the meeting, did they request any

20  additional evaluations?

21  A    I don't recall.  I don't think so.

22          Q    And if you can turn -- I'm sorry -- if you

23  can turn to tab three.  Can you identify that document?

24  A    That's the social assessment that was done by Kim

25  Rom.

Hensal - Direct                                54

1                                  (J-3 Marked for

2                                   Identification)

3          Q    And who is Kim Rom?

4     A    The social worker on the team.

5          Q    Did you review this as part of the

6     eligibility meeting?

7     A    Yes.

8          Q    Did Ms. Rom's -- was Ms. Rom at the meeting?

9     A    She was.

10         Q    And did she discuss the results of her social

11    assessment at the meeting?

12    A    From what I remember, yes.

13         Q    Okay.  Was there any -- any specific concern

14    raised as a result of the social assessment with

15    regards to A.K.'s functioning (out of microphone

16    range)?

17    A    No.

18         Q    And if you can turn to tab six -- sorry --

19    tab eight.  (Out of microphone range) you are not the

20    recipient of -- of this, but were you -- you were the

21    case manager --

22    A    Yes.

23         Q    -- for A.K.  Did Ms. Rom share this e-mail

24    with you?  Tab eight.

25    A    Tab eight?  I'm sorry.  She did tell me about it,

Hensal - Direct                              55

1      yes.

2           Q    Okay.  And do you know if Ms. Rom contacted

3      the parents in response to this?

4      A    Yes, she called.

5           Q    Okay.  And is -- are e-mails an acceptable --

6      does the District accept e-mails for --

7                MR. SOUTAR: Objection, Your Honor.  I object

8      to any testimony regarding whether e-mail is an

9      appropriate method, by Board policy, to communicate

10     with the District.

11               MS. KENNY: Your Honor, I didn't ask about

12     appropriateness.  I just asked a fact.

13               MR. SOUTAR: Yeah, and I would object, Your

14     Honor, because I think that there is a Board policy

15     that purports to prevent a parent from communicating

16     with the District via e-mail for the evaluation and

17     identification of a child for special education

18     services, which flies in the face of the IDEA and is

19     expressly prohibited by the IDEA.

20               THE COURT: I mean, I don't know if this is

21     even an area we need to explore.  I think you just want

22     to get to the subject matter of the e-mail.  So if you

23     maybe want to move on or ask -- to a different -- or

24     ask it differently, you know, we can avoid this issue.

25     Because I don't know that this is necessary, to go down

Hensal - Direct                    56

1      this path.

2                     MR. SOUTAR: I would --

3                     THE COURT: Unless you -- unless we do.

4                     MS. KENNY: I think it needs to be fleshed out

5      now, Your Honor.  I believe that it's going to be an

6      issue raised by the petitioner.

7                     THE COURT: Okay.  So then ask your question

8      one more time so I can --

9                     MS. KENNY: I'm sorry -- by respondent.  I

10     forget I'm petitioner.

11                    THE COURT: Yeah, just ask your question one

12     more time so I know I'm on the same page.

13                    MS. KENNY: Okay.

14     BY MS. KENNY:

15        Q     Does the District have a policy regarding the

16     acceptance of -- the use of e-mails to accept requests

17     for evaluations?

18                    MR. SOUTAR: And I would object to that, Your

19     Honor.

20                    THE COURT: Okay.  And the basis of the

21     objection is what again?

22                    MR. SOUTAR: Is that if there is a policy, it

23     would be ultra vires, Your Honor.  It would violate --

24     if I may approach?

25                    THE COURT: Hold on.  Because if there's a

Hensal - Direct                                              57

1    policy -- well let's -- if the answer is no, there is

2    no policy, then we don't need to go down the road, so

3    let's get the answer first.  So, overruled.

4              THE WITNESS: Yes, there is a policy.

5              THE COURT: Listen, if there's a policy, if

6    you want to make a legal argument about whether that

7    flies in the face of the IDEA, you can certainly make

8    that argument, but let's -- let's get the facts.  Let's

9    explore this.

10             MR. SOUTAR: Do we have to explore whether --

11   now that we know that there is a policy, do we even

12   need to know what it is?  Because the IDEA specifically

13   says that the school district cannot abrogate the

14   parents' rights with respect to --

15             THE COURT: Well now you're making an argument

16   that I'm not going to rule on right now, so let's get

17   this information.  You can put that in your post-

18   hearing brief.

19             MS. KENNY: May I approach, Your Honor?

20             THE COURT: Yes.

21   BY MS. KENNY:

22        Q    Ms. Hensal, if you can turn -- there's

23   actually numbers on this document.  Page numbers are at

24   the top.  But if you could turn to page four, paragraph

25   18?  I'm sorry.  Can you identify that document for me

Hensal - Direct                                          58

1    first?

2    A    It's the policy.

3             THE COURT: Why don't I mark this P-1 for

4    identification.

5             MS. KENNY: Yes, Your Honor.  Thank you.

6             THE COURT: Okay.

7                                        (P-1 Marked for

8                                        Identification)

9    BY MS. KENNY:

10        Q    And based on a quick review of it, does this

11   appear to be a complete and accurate copy of the

12   Board's policy on special education?

13   A    Uh huh.

14        Q    And if I can direct your attention to page

15   four, paragraph 18, is that the paragraph that you're

16   referring to, that the Board does not accept the use of

17   e-mail?

18   A    Yes.

19             MS. KENNY: Your Honor, we request to move

20   this P-1 into evidence.

21             MR. SOUTAR: Objection, for the record, Your

22   Honor.

23             THE COURT: Objection, to?

24             MR. SOUTAR: To moving that document into

25   evidence.

Hensal - Direct                                           59

1           THE COURT: On what basis?

2           MR. SOUTAR: On the basis that it contains a

3     provision that is ultra vires.

4           THE COURT: Okay.  Noted for the record.  I'm

5     going to accept it into evidence.  There's no issue

6     regarding its authenticity --

7           MR. SOUTAR: There is not.

8           THE COURT: -- its genuineness and all that.

9     If you want to make argument about it, that's perfectly

10    fine.

11                                    (P-1 Entered into

12                                    Evidence)

13    BY MS. KENNY:

14       Q    And Ms. Hensal, what was Ms. Rom's response

15    to the parent's e-mailed request for -- I'm sorry.

16    Going back to tab eight, which is the e-mail requesting

17    the -- what was the parent's e-mail requesting?

18           MR. SOUTAR: Objection.  Foundation.

19           MS. KENNY: We had talked about the e-mail.

20           MR. SOUTAR: Right.  Didn't you ask her what -

21    -

22           MS. KENNY: She was aware that --

23           MR. SOUTAR: Right.

24           MS. KENNY: -- that Ms. Rom shared it with

25    her.

Hensal - Direct                                      60

1            MR. SOUTAR: Right.  Do we know that Ms. Rom

2       shared with her her response to the parent?  Wasn't

3       that the question?

4            MS. KENNY: I backed up.  I'm sorry.

5            MR. SOUTAR: Okay.

6       BY MS. KENNY:

7            Q    Ms. Rom shared with you this document, the e-

8       mail -- I'm sorry --

9       A    Yes.

10           Q    -- the contents of the e-mail.  Specifically,

11      what was the parent seeking via this e-mail?

12      A    An independent -- independent evaluations.

13           Q    And are you aware -- you already had

14      testified that you're -- that you know that Ms. Rom

15      responded to the parent.

16      A    Yes.

17           Q    Are you aware of not necessarily the exact

18      phrasing or anything, but what that -- how Ms. Rom

19      responded?

20      A    I know she told them they have to write a letter

21      to -- addressed to the director and sign it.

22           Q    Okay.  And if you could turn to tab nine?

23      Are you aware of this letter?

24      A    Yes.

25           Q    And this letter did not come to you, did it?

1    A    No, it did not come to me.

2         Q    It was addressed to Mr. Anthony Giordano.

3    Did you discuss this with Mr. Giordano?

4    A    Yeah.  He told us about it, yes.

5         Q    And then going back a little -- I'm sorry I'm

6    backtracking a little -- if you could go to tab seven,

7    we're back at the eligibility meeting.  So at the

8    eligibility meeting, you already testified that the --

9    did the parent -- I believe you already answered this,

10   but just to make sure.  Did the parent request any

11   additional evaluations during that meeting?

12   A    No.

13        Q    Okay.  And based on your assessment and the

14   review of all of the reports and evaluations that were

15   available, were you able to determine whether A.K. had

16   a disability?

17   A    No, we determined that -- well, he -- disability

18   in terms of, like, impacting his education?

19        Q    Just a disability.

20   A    No.

21        Q    Does he have any -- any diagnoses that --

22   A    Well, yes -- sorry -- he does have the diagnoses

23   of autism and attention deficit hyperactivity disorder,

24   but I did not -- we did not feel that was impacting his

25   attention.

Hensal - Direct                          62

1    Q    So based on your assessment and the review of

2    the other documentation that was available, were you

3    able to determine his present levels of academic and

4    functional performance in school?

5    A    Yes.

6         Q    And what was that determination?

7    A    That his academic performance was grade level or

8    above.

9         Q    Did you -- was there any -- through the

10   evaluation process, was there any indication that A.K.

11   had an inability to learn that cannot be explained by

12   intellectual, sensory, or other health factors?

13   A    No.

14        Q    Was there any indication that A.K. had an

15   inability to build or maintain satisfactory

16   interpersonal relationships with peers or teachers?

17   A    No.

18        Q    Was there -- did A.K. -- when you were

19   interviewing A.K., did you discuss with him his

20   interactions with peers?

21   A    Yes.

22        Q    Can you kind of share with us what he -- what

23   he reported?

24   A    He reported that he has three friends in school.

25   I don't remember much more than that, but --

Hensal - Direct                                63

1      Q     Did he report having any negative experiences

2   with peers in school?

3   A     Sometimes, yes, he did.

4      Q     And did he report any -- any relationships

5   with teachers?

6   A     He didn't report anything negative with teachers

7   that I remember.  He talked about his teacher, his

8   current teacher -- yes.

9      Q     And did any teachers report any difficulty

10  having a relationship with A.K.?

11  A     No.

12     Q     And did your -- did the evaluations indicate

13  any -- that there was -- that A.K. was experiencing any

14  inappropriate types of behaviors or feelings under

15  normal circumstances?

16  A     No.

17     Q     Is that something that would be assessed

18  through your psychological --

19  A     If he's feeling -- I'm sorry.

20     Q     Any -- any inappropriate types of behaviors

21  or feelings under normal circumstances, is that

22  something that you think would have come through on --

23  A     Yes.

24     Q     -- the assessments that you administered --

25  A     Uh huh.

Hensal - Direct                                    64

1        Q    -- the BASC or --

2    A    Yes, or the interviews with the teachers and

3    behavioral observations -- yes.

4        Q    Was there any indication that A.K. has a

5    general pervasive mood of unhappiness or depression?

6    A    No.

7        Q    Did he --

8    A    Not from talking with him and seeing him in the

9    classroom.

10       Q    And was there any indication that A.K. had a

11   tendency to develop physical symptoms or fears

12   associated with personal or school problems?

13   A    Not in school.  We did not see that.

14       Q    Did he report anything specific, you know, in

15   your interviews and in conducting the BASC --

16   A    No.

17       Q    -- did A.K. report any -- anything similar to

18   that?

19   A    No, not that I remember.

20       Q    Is there -- is your -- would your

21   psychological evaluation, in conjunction with the

22   results of the neuropsychological, have fleshed out

23   these issues?

24   A    Yes, I believe so.

25       Q    Did you have any reservations about the

Hensal - Direct                                    65

1    appropriateness of the initial evaluation that was

2    completed by the child study team?

3    A    No.

4         Q    In your professional opinion, was your

5    evaluation appropriate for assisting the team in

6    determining A.K.'s eligibility?

7    A    Yes.

8         Q    Is there -- is there any area that you feel

9    as though was not appropriately assessed and that may

10   have impacted A.K.'s eligibility for special education?

11   A    No.

12        Q    Is there any additional -- if a psychiatric

13   evaluation was conducted and he -- and it was

14   determined that he had some psychiatric diagnoses --

15   diagnosis or diagnoses -- would that have impacted --

16   can you think of any diagnosis that would impact the

17   team's eligibility determination?

18   A    No.

19        Q    Why not?

20   A    Because it wasn't an educational impact.  There

21   wasn't an educational impact.

22        Q    In your professional opinion, did -- were the

23   evaluations performed comprehensive?

24   A    Yes.

25        Q    Did they assess A.K. in all areas of

1    suspected disability?

2    A    Yes.

3         Q    And what is your professional opinion as to

4    whether additional evaluations would be useful for A.K.

5    at this time?

6    A    In my opinion, I don't think it's necessary.

7         Q    Why not?

8    A    Because I don't -- again, I don't think there's an

9    educational impact.  That's typically what -- that is

10   what we look for when we're classifying a child under

11   special education.  We look to see if it impacts them

12   in the classroom and it wasn't impacting him.

13             MS. KENNY: No further questions, Your Honor.

14             THE COURT: Whenever you're ready.

15             MR. SOUTAR: Thank you, Your Honor.

16   CROSS EXAMINATION BY MR. SOUTAR:

17        Q    Good morning.

18   A    Good morning.

19        Q    Just to review very briefly, so you attended

20   the evaluation planning meeting.

21   A    Yes.

22        Q    And the parent had raised, at that point,

23   that one of the areas of suspected disability was

24   emotional disturbance.

25   A    Yes.

Hensal - Cross                          67

1        Q    And as part of the testing that was done, you

2    did a functional psychological evaluation, right?

3    A    Yes.

4        Q    And you state in your report as it -- in the

5    beginning that the reason for the referral was the

6    social and emotional well-being of A.K., right?

7    A    Yes.

8        Q    And as I understand it, you conducted testing

9    of A.K. using the BASC test.

10   A    Uh huh.

11       Q    And specifically, you gave a version to the

12   teacher?

13   A    Yes.

14       Q    And you gave a version to A.K. and you gave a

15   version to the parents.

16   A    Yes.

17       Q    And I understand from your report that the

18   reason that you used the teacher rating scale is to

19   give insight on how the child behaves and performs

20   within the classroom.

21   A    Uh huh.

22       Q    Is that right?  And you give the parent

23   rating scale to get insight into how the child behaves

24   and performs at home.

25   A    Uh huh.

Hensal - Cross                                    68

1        Q     Right?  And then you give the scale to the

2    child so that you can assess their everyday feelings

3    and behaviors.

4    A     Right.

5        Q     Okay.  And you did that in this case, right?

6    A     Yes.

7        Q     You gave it to the -- to the parent, you gave

8    it to the teacher, and you gave it to A.K.

9    A     Yes.

10       Q     Okay.  Now when you did these evaluations, it

11   was November of 2017, right?

12   A     Right.

13       Q     Okay.  And so at that point, Ms. Correra,

14   A.K.'s homeroom teacher, had known A.K. for, what,

15   maybe -- maybe two months approximately.  And you also

16   mention in your report that by the middle of November -

17   - in this case, November 20th -- A.K. had 12 excused

18   absences already.  Did you inquire with Ms. Correra

19   whether she was aware of why he had been absent 12

20   times already by the middle of November?

21   A     No, I didn't ask Ms. Correra, no.

22       Q     Okay.  Did you ask the parent why he had been

23   absent 12 times by the middle of November?

24   A     I believe they shared that at the meeting, but

25   typically, he gets migraines.

Hensal - Cross                          69

1       Q    Okay.  So you were aware that he gets

2    migraines.

3    A    Yes.

4       Q    And you're aware that they had been, at this

5    point, increasing in frequency?

6    A    No, I did not know they were increasing in

7    frequency.  I knew that he had absences for migraines.

8       Q    Okay.  And so where it says in your report

9    that "His severe migraines are increasing in frequency"

10   --

11   A    Oh, I don't recall that then.

12      Q    Okay.

13   A    Yeah, from the meeting.

14      Q    Okay.  And you were also aware that he was

15   urinating in his bed at night?

16   A    Yes, I do remember Mom saying that.

17      Q    And that he was afraid to come to school.

18   A    Yes.

19      Q    That he experienced anxiety in school.

20   A    Yes, that was all reported by the parents.

21      Q    Okay.  And so you were aware of all of that

22   when you did your report --

23   A    Yes.

24      Q    -- and when you gave the three BASC

25   assessments.  When you noticed that A.K. had been

1    absent 12 times already in 2017, did you happen to look

2    back at his previous attendance records?

3    A    Yes, I did.

4         Q    Okay.  Do you remember what you saw?

5    A    He was absent frequently, yes.  He was absent

6    frequently.

7         Q    Did you inquire into the reason for his

8    frequent absences?

9    A    No.  I mean, the parent had shared that it was

10   migraines, so I assumed.

11        Q    And did the parent also share with you that

12   the migraines were brought on by stress?

13   A    Yes.

14        Q    And that they increased in frequency during

15   the school year?

16   A    Well, yes.  I didn't remember that, but that was

17   in my report.

18        Q    Okay.  Now in your report, you determined

19   that you needed to discount the parent's responses to

20   the BASC report, didn't you?

21   A    No.

22        Q    Did you state that they needed to be

23   interpreted with caution?

24   A    Yes, that's the scale that comes up when you score

25   the behavior assessment scale.

1      Q    And so in this case, is it fair to say that

2      you determined that the teacher's BASC results were

3      more reliable than the parent's BASC results?

4      A    Yes.

5           Q    And so in preparing your report, you've

6      relied more on a teacher who had known A.K. for two

7      months, a -- I'll use the word "significant" -- a

8      significant amount of time in which he was absent from

9      school, and you gave that more weight than you gave to

10     the parent's?

11     A    I wouldn't necessarily say I gave that more

12     weight, but there was a validity scale that was brought

13     up, so I -- but seeing A.K. in -- I took into account

14     seeing A.K. in school and speaking with him as well.

15          Q    Okay.  Did you consider, once you saw that

16     the infrequency scale was elevated, did you consider

17     giving the test to Mr. K.?

18     A    No.  I typically only give it to one parent.

19          Q    And it's fair to say that the parent noted

20     many difficulties with A.K.?

21     A    Yes, it is.

22          Q    And A.K. himself reported to you that he gets

23     stressed --

24     A    Uh huh.

25          Q    -- and that he feels stressed.  And you also

1    observed A.K., right?

2    A    Yes.

3         Q    You observed him in a math class.  I think

4    that's what the report says.  It doesn't say in here

5    that you observed him anywhere outside the math class.

6    A    Right.

7         Q    So you didn't observe him in the lunch room,

8    you didn't observe him on the playground with his

9    peers.

10   A    No.

11        Q    You didn't observe him passing in the

12   hallways.  You didn't observe him in any art classes,

13   any music classes, any other elective, special-type

14   classes.

15   A    No.

16        Q    Okay.  And you were aware that in addition to

17   the mother reporting problems that the father also

18   reported problems with A.K.?

19   A    Yes, similar to what Mom said.

20        Q    Okay.  And that A.K. generally was being

21   bullied at school.  Yes?

22   A    Yes, that was what they said.

23        Q    And that he was afraid to come to school.

24   A    Yes, that's what they said.

25        Q    You also mentioned that A.K. is on the autism

Hensal - Cross / Redirect                                73

1    spectrum and that he suffers from ADHD.  But we also

2    know from the testing that he's got a fairly high level

3    of intelligence, at least on peer (sic) with his

4    classmates, and his achievement is also on peer (sic) -

5    - on level with his classmates.

6    A    With his age, yes.

7        Q    Does your testing demonstrate what A.K. might

8    be capable of if he had appropriate supports in place

9    such that he wasn't anxious or afraid to come to

10   school?

11   A    No, we don't -- we don't account for that.

12       Q    Okay.  And you also don't account for how he

13   would be able to perform if he wasn't absent 12 days by

14   the first two months of school.

15   A    No, we don't.

16           MR. SOUTAR: That's all I have, Your Honor.

17           THE COURT: Any redirect?

18           MS. KENNY: Just a few, Your Honor.

19   REDIRECT EXAMINATION BY MS. KENNY:

20       Q    Ms. Hensal, it was discussed during cross

21   examination that your report indicated that the

22   parent's report score recording on the BASC should be

23   interpreted with caution.  Is that -- is that a

24   subjective decision that you made?

25   A    No, no.

Hensal - Redirect                                 74

1      Q    Can you explain how that -- how you decided

2    that the results need to be interpreted with caution?

3    A    So we input our scores into a computer program and

4    it tells you what scales that come up with caution and

5    then it will tell you items from those scales which you

6    should interpret it with caution -- interpret with

7    caution.

8      Q    So is it fair to say that it is the publisher

9    of the BASC that makes that determination?

10   A    Yes.

11     Q    And was -- did a similar interpretation --

12   flagging, so to speak -- come up for A.K.'s results?

13   A    No.

14     Q    Did they come up for the teacher's results?

15   A    No.

16     Q    And you acknowledge that the parent reported

17   that A.K. was urinating in bed and afraid to come to

18   school.  Did you discuss any of that with A.K. during

19   your interview?

20   A    Not the bed wetting.  And I talked to him about

21   school; I didn't talk about if he was afraid to come to

22   school.  But he talked about school, yes, with me.

23     Q    Did he make any mention of being afraid in

24   school --

25   A    No.

1        Q    -- or coming to school?  In your experience

2    as a school social worker, have you had interactions

3    with students that are afraid to come to school?

4    A    School psychologist?

5        Q    I'm sorry.  I don't know what I said, but I

6    apologize.

7    A    Social worker.

8        Q    Sorry.

9    A    Yes, I have.  I have had incidences where children

10   are afraid to come in.

11       Q    And does that impact them in -- how does that

12   impact them when they're actually in school?

13   A    They get nervous.  They're typically not in class.

14   They don't perform in the classroom.  A lot of anxiety.

15   Most of the time, they spend in with the guidance

16   counselor or myself.

17       Q    And was there any reports that A.K. was

18   spending, you know, a lot of time outside of the

19   classroom?

20   A    No.

21       Q    And there was discussion about his

22   attendance.  How was his -- what about his tardiness?

23   A    I don't believe he was ever tardy, but I don't --

24   I don't remember that.  I would have written that in my

25   report.

Hensal - Redirect / Colloquy                    76

1        Q    And the parent's report is that -- it was

2   discussed on cross examination that the parent reported

3   he was being bullied in school.  Did you look into

4   whether there was any harassment, intimidation,

5   bullying, HIB, findings?

6   A    So I spoke with the guidance counselor who is in

7   charge of the HIB and according to him, no, there were

8   no HIBs -- HIBs reported -- yeah -- or found.

9        Q    And when you asked the parent to complete the

10  BASC, did you specify which parent needed to complete

11  it?

12  A    I don't remember, but I called Mom, so I asked

13  Mom.

14       Q    Was there a reason that you would have called

15  Mom rather than Dad?

16  A    Most of the time, it was Mom involved or our

17  communication was with Mom.  Dad did come to the

18  meeting, though.

19       Q    Okay.  And is a student experiencing stress a

20  reason to classify a student for special education

21  services?

22  A    No.

23            MS. KENNY: No further questions, Your Honor.

24            THE COURT: Any --

25            MR. SOUTAR: Just a --

Colloquy / Hensal - Recross                    77

1            THE COURT: Sure.

2            MR. SOUTAR: -- brief recross.

3            THE COURT: Go ahead.

4    RECROSS EXAMINATION BY MR. SOUTAR:

5        Q    I'd like to revisit just a couple of things,

6    the first is you testified that you didn't recall

7    whether he had any lateness and you thought that it was

8    none.

9    A    Because typically, I write it in my report, as

10   well as absences.

11       Q    Do you recall whether he had any tardies from

12   his fourth grade year?

13   A    No, I don't recall that.

14           MR. SOUTAR: Your Honor, plaintiff's seven --

15           THE COURT: Well, you being respondent, so

16   we'll make the --

17           MR. SOUTAR: Oh, I'm sorry.

18           THE COURT: That's all right.

19           MR. SOUTAR: I'm so used to --

20           THE COURT: I know, I know.  So you --

21           MR. SOUTAR: I think I complained about that

22   before.  Didn't I, Your Honor?  My apologies.

23           THE COURT: No, that's okay.  So you want this

24   identified as R-7 then?

25           MR. SOUTAR: Yes, please identify it as R-7.

1              THE COURT: Okay.

2                                      (R-7 Marked for

3                                      Identification)

4    BY MR. SOUTAR:

5         Q    Do you recognize the general format of this

6    document?

7    A    Yeah.

8         Q    What is this document?

9    A    This is the printout from our -- from our computer

10   program to talk about attendance and tardies.

11        Q    Okay.  And does this relate to A.K.?

12   A    Yes, it does.

13        Q    And what school year is this for?

14   A    The 16/17.

15        Q    Would you please take a look at the column

16   that relates to excused tardies and does -- did A.K.

17   have any tardies during his fourth grade year?

18   A    He did.

19        Q    Just take a minute.  How many did he have?

20   A    Nine.

21        Q    I believe it goes over onto the next page.

22   A    Yeah, it looks like there are six on the first

23   page and three on the second.

24        Q    Excused tardies?

25   A    Oh, I'm sorry.  I'm sorry.  I thought you were

Hensal - Recross                                79

1    asking -- one -- one excused tardy.

2         Q    Just to be clear, you're looking at the

3    column -- on top, it says, "E-X-C, dot, tardy."

4    A    Right.  It says, "Description -- Excused Tardy

5    With Time."  There's one for 10:47 a.m.  The other ones

6    are unexcused tardies with time.

7         Q    And so, for example, on the entry for

8    December the 12th, which is, I think, the one that

9    you're looking at --

10   A    Oh, I see where you're looking now.  You're

11   looking at this column?

12        Q    Yes.

13   A    Okay.  I was looking at the description.

14        Q    And how many are listed in that "Excused

15   Tardy" column?

16   A    If I'm looking at the column you are, seven.

17        Q    Okay.  And then you mentioned earlier that

18   there were some unexcused tardies as well.  And how

19   many of those are there?

20   A    Two.

21        MS. KENNY: Objection, Your Honor.  This chart

22   is being interpreted incorrectly.

23        THE COURT: I mean, I -- I -- I think I'm

24   recognizing that as well.  Maybe we need to have an

25   explanation about how to interpret it because I'm

1    reading it differently as well.

2    BY MR. SOUTAR:

3        Q    Do you know how to interpret this chart?

4    A    So from my understanding and what I've done, I've

5    looked at the description column and that tells you.

6        Q    Okay.  And based on that, let's go back then.

7    How many excused tardies do we have?

8    A    One on 12/12/16.

9        Q    Okay.  And how many unexcused tardies do we

10   have?

11   A    Eight.

12       Q    And am I correct that that would be in

13   addition to 28 absences?

14   A    Yes.  I didn't count all the absences, but --

15       Q    Okay.  You also mentioned before that you

16   called the parent.  Did you communicate with the parent

17   in any other ways?

18   A    I don't believe I did.  I don't -- I don't know.

19   I probably e-mailed them the meeting notices, but other

20   than that, I don't recall.

21           MR. SOUTAR: Okay.  Nothing further, Your

22   Honor.

23           THE COURT: Okay.  Anything else?

24           MS. KENNY: No, Your Honor.

25           THE COURT: All right.  Thank you.

                              Colloquy                    81

1                THE WITNESS: Thank you.

2                THE COURT: You may step down.

3                Did you have any other witnesses?

4                MS. KENNY: No, Your Honor.  We rest.

5                THE COURT: You rest?  Very good.

6                I know you have a witness.  Did you want to

7       take a few minutes or did you want to begin?

8                MS. K.: I can begin.

9                MR. SOUTAR: You want to begin?  Okay.

10               THE COURT: Okay.  You know what?  Okay.

11      Let's take five minutes just for a quick break.  I

12      didn't ask on this side and they're -- I'm sorry.  And

13      also, excuse the witness.  So we'll go off the record.

14                          (BRIEF RECESS)

15               THE COURT: Back on the record after a short

16      break and I take it, Mr. Soutar, we're ready for your

17      witness.

18               MR. SOUTAR: Thank you, Your Honor.  K.K., the

19      respondent.

20               THE COURT: If you would, ma'am, please come

21      forward.  Before you sit down, if you could just raise

22      your right hand so I may swear you in.

23      K.   K., RESPONDENT, SWORN.

24               THE COURT: Please be seated and just state

25      and spell your name for the record.

1            THE WITNESS: K.K.

2            THE COURT: Thank you.

3     DIRECT EXAMINATION BY MR. SOUTAR:

4        Q    K.K., I know you're a little bit nervous, so

5     let's -- let's talk about some easy questions.  Let's

6     talk about A.K., all right?

7     A    Okay.

8        Q    Just briefly, when was the first time that

9     you noticed that A.K. might have challenges that other

10    kids wouldn't?

11    A    When I first time saw him in the isolette when he

12    was born a 24-weeker and he had a 40 chance to survive.

13    So when first time I saw him, he was one pound, eight

14    ounces, and he was 710 grams.  So when first time I saw

15    him, I realized that he's not going to be like a

16    regular child (out of microphone range).  I even don't

17    know if he is going to survive, but I said that I will

18    take whatever, whatever will come my way, as long as

19    he's going to be with me.

20       Q    Was A.K. ever classified to receive special

21    education services?

22    A    Yes.

23       Q    When?

24    A    He was two years old and he didn't -- he couldn't

25    talk at all, so I took him to a pediatric specialist at

K.K. - Direct                                83

1    Morristown Memorial.  Since he was born as a micro-

2    preemie, they had to be monitored.  I couldn't take him

3    earlier because he was constantly in the hospital -- in

4    and out, in and out.  He was very sick.

5         So when I took him, first thing that she said, she

6    said that he was mentally retarded and he needs early

7    intervention as soon as possible.  So the whole team

8    came and they started working with him.  There were

9    four people and they worked -- they came three times a

10   week.  I'm very grateful.  There was a speech

11   therapist, occupational therapist, physical therapist,

12   educational specialist and they did an amazing job.

13   They actually -- they started working with him and

14   about eight months, he started talking and he started

15   doing things that he never did before.  He started

16   playing.  There was still no eye contact and he didn't

17   (out of microphone range) himself, but it was still

18   more and more, I would say, what the regular kids would

19   do.

20        Q    Okay.  What about when A.K. got older?  Did

21   he remain classified for special education services?

22   A    Yes.

23             MS. KENNY: Objection.  Your Honor, we're

24   really going back to the start of time and --

25             MR. SOUTAR: We'll go through this quickly

K.K. - Direct                                  84

1    then.

2                    THE COURT: I'll allow it.

3                    THE WITNESS: Yes, he did -- yeah.

4    BY MR. SOUTAR:

5        Q    Did he remain classified all through his

6    school career?

7    A    Yes, until he was declassified.  That happened in

8    second grade, I believe.

9        Q    Okay.  And where was he going to school in

10   second grade when he was declassified?

11   A    That was Northvail.

12       Q    Okay.  In the Parsippany-Troy Hills School

13   District?

14   A    Yeah, Parsippany-Troy Hills.

15       Q    Was A.K. ever diagnosed with -- does A.K.

16   have any diagnoses?

17   A    Yes, he does.  He is diagnosed with migraine/

18   epilepsy.

19       Q    Okay.

20   A    It's all connected.  Whenever he has a migraine,

21   he has a seizure.  He has asthma.  He has -- he's on

22   autistic spectrum disorder.  He has ADHD.  Also, he has

23   a cyst sitting in the pineal area in the brain that's

24   also affecting his visual activity.  I'm not sure if

25   it's really -- if that's what it is.

K.K. - Direct                          85

1          Q    After A.K. was declassified, were there ever

2     any occasions where you notified the school that you

3     believed that, for example, A.K. being on the autism

4     spectrum impacted his education?

5     A    I believe so.  I believe so, yeah.

6          Q    Okay.  Can you tell me how you have seen it

7     impact, for example, A.K.'s relationship with friends?

8     A    Unfortunately, he doesn't have any friends and

9     that's -- that's actually very sad because he always

10    wanted to have friends but he never could develop any

11    relationship with children because he is very different

12    from others and that's understandable.  I mean, I do

13    understand.

14         Q    How is he different from other children?

15    A    So, first of all, I would say that he doesn't know

16    how to communicate with peers.  He would be -- he

17    doesn't know what is personal space, so he would be

18    very close into the child, and he will repeat the same

19    phrase many times and he cannot -- he cannot share his

20    things.  Basically, I would say whatever belongs to

21    him, it's like a continuation of himself, so he would

22    react very inappropriate whenever somebody would touch

23    something of -- that belongs to him.  But at the same

24    time, he would be a little bit -- other kids would call

25    him weird or annoying because he would ask them, "Would

K.K. - Direct                                    86

1    you play with me?  Would you play with me?"  Also, he

2    cannot play any sports, first of all, due to his

3    asthma; second, due to his sensory integration

4    disorder, because he is afraid of being hit with the

5    ball.  And that's another thing.

6         Q    So does his sensory integration disorder have

7    any other impacts besides being afraid of the ball?

8    A    Handwriting.  Basically, yes, it affects his

9    handwriting and until this day, his handwriting is very

10   hard to decipher, which I actually mentioned many times

11   to his teachers.

12        Q    Okay.  What about the classroom environment?

13   Does A.K.'s sensory integration disorder have any

14   impact or does the classroom have any impact on his

15   sensory integration disorder?

16        MS. KENNY: Objection, Your Honor.  There is

17   no foundation that this -- that the parent has even

18   seen A.K. in the classroom.

19        THE COURT: Sustained.  Could we lay a

20   foundation?

21        MR. SOUTAR: Uh huh.

22   BY MR. SOUTAR:

23        Q    Has A.K. ever told you about his classroom

24   environment?

25   A    Yes, he did.

1      Q     How has he explained it to you?

2      A     He explained that it's very loud for him and he

3      cannot tolerate loud noises and bright -- bright

4      lights.  Also, he feels very uncomfortable in any

5      environment that has more than five to ten people.

6      What he explains to me that physically, he experiences

7      that his (out of microphone range) started to hurt and

8      his whole body is shaking and he's trying to hold

9      himself.  That's what he says.

10     Q     Are there any other ways in which A.K.'s

11     medical conditions make him appear different than other

12     children?

13     A     Yes.  Also, he has -- his left vocal chord is

14     paralyzed from the (out of microphone range) surgery

15     that he had when he was 19 days old.  They had to (out

16     of microphone range) so he can live, and so, since

17     then, his voice is very, very soft.  To bring his voice

18     up, it's appearing very squeaky and kids made a lot of

19     fun on that aspect.  And also, I mean, that's probably

20     -- I mean, that's what I would add, yeah.

21     Q     Okay.  Let's focus just for a minute on

22     A.K.'s fear of groups that are larger than, say, five.

23     Did you ever communicate that to the school?

24     A     Yes.

25     Q     Do you remember any specific incidents?

K.K. - Direct                                        88

1    A    Yes.

2              MS. KENNY: Objection.  Your Honor, this is

3    not relevant as to whether or not we need an

4    independent evaluation.

5              THE COURT: Yeah.  Where are we going with

6    this?

7              MR. SOUTAR: We're going that the school was

8    on notice of A.K.'s emotional difficulties and that the

9    testing did not reach that area.

10             THE COURT: All right.  Well then let's --

11   let's get to what she told the team.

12             MR. SOUTAR: That's where I'm going, Your

13   Honor.

14   BY MR. SOUTAR:

15        Q    How did you communicate that to the school

16   district?  Do you remember?

17   A    First I called to Mr. Breiten and then I e-mailed

18   to him and I just told him that whenever A.K. comes to

19   school a little bit early and there's a gathering

20   inside in the gym, it's very hard for him to sustain

21   that environment, so if there's any other way we can

22   avoid that.  And Mr. Breiten suggested that he can

23   wait, maybe, in the front area with the secretary and

24   then he can go straight to his classroom.  So that

25   worked.

K.K. - Direct                                89

1    Q    Okay.  There are two binders in front of you.

2    One is entitled "Respondent's Exhibits."  Could you

3    please turn to tab one?

4    A    Okay.

5    Q    And take a minute to look at it.  And after

6    that, my question is, is this the e-mail that you sent

7    to Mr. Breiten to let him know about A.K.'s issues?

8    A    Yes, I recognize that, yeah.

9                                    (R-1 Marked for

10                                   Identification)

11           MS. KENNY: Objection.  Again, Your Honor,

12    relevance.  I mean, this is going back to 2016.  The

13    evaluation --

14           MR. SOUTAR: This is a longstanding problem,

15    Your Honor.

16           MS. KENNY: The evaluation -- I mean, the

17    request for the independent evaluation came in -- in --

18    yeah, March of '18.

19           MR. SOUTAR: It's amazing that it took that

20    long, Your Honor.

21           THE COURT: All right.  I'll allow it.  Go

22    ahead.

23    BY MR. SOUTAR:

24    Q    And so, does this -- is this the e-mail that

25    you sent to Mr. Breiten to --

1     A     Yes.

2          Q     -- alert him to the issues that A.K. had with

3     crowds?

4     A     Yes.

5          Q     And in here, did you tell him -- did you tell

6     Mr. Breiten some of the impacts that being in a large

7     crowd had on A.K.?

8     A     Yes, I did.

9          Q     Okay.  Were there any other incidents where

10    A.K. had issues interacting with his peers?

11    A     There were many.  There were many cases.  In the

12    beginning of the -- actually, in the beginning of the

13    fifth grade, they started bullying him just because his

14    reaction was different to whatever one of the boys said

15    and I called Mr. Breiten.  First there was no response

16    and then my husband -- actually, he went directly to

17    Mr. Martens, to the principal, and had Mr. Martens

18    address that because it was going on for about --

19    probably two weeks and that was very intimidating for

20    him.

21         Q     What do you understand was happening?

22    A     It happened -- it happened at -- I think A.K.

23    revealed some kind of information because he doesn't

24    have a filter.  Whatever is being asked from him, he is

25    going to tell it just as it is.  And the boys started

K.K. - Direct                          91

1    clapping him out whenever they would see him.  So

2    first, they (out of microphone range) him and then also

3    they would clap him out whenever he would come to the

4    gathering.

5         Q    What does that mean, they would "clap him

6    out"?

7    A    They would just clap their hands and say, "A.K.,

8    get out.  A.K., get out."  And there were many teachers

9    actually standing there.  They never paid attention to

10   that.

11        Q    And how do you know that was going on?

12   A    I was an observant to that and I actually called

13   my son and I said, "What's going on?"  So he explained

14   to me, but he said, "Mom, please don't tell anybody.

15   It's going to end at some point."  I said, "Okay."  But

16   then when I saw that it was -- it just kept going, I

17   called Mr. Breiten.  He said, "Okay, I'm going to

18   talk."  But it kept going and then my husband saw it

19   and he just lost it completely.  He went to the

20   principal and he asked Mr. Martens and Mr. Martens

21   suggested (out of microphone range.  And actually, (out

22   of microphone range) -- both grades, all the boys were

23   involved.

24        Q    Were there other occasions where you talked

25   to Mr. Breiten about issues that A.K. was having in

K.K. - Direct                                92

1    school that affected his emotional well-being?

2                MS. KENNY: Objection.  Your Honor, Mr.

3    Breiten isn't even a member of the child study team.  I

4    mean, we're --

5                THE COURT: Yeah.

6                MR. SOUTAR: Mr. Breiten is --

7                MS. KENNY: I mean, we -- it's already on the

8    record that we (out of microphone range) the parents'

9    concerns of his social emotional and peer interactions.

10               MR. SOUTAR: This is a longstanding issue,

11   Your Honor, and Mr. Breiten --

12               THE COURT: What is a longstanding issue?

13               MR. SOUTAR: The school's notice of A.K.'s

14   emotional issues.

15               THE COURT: Okay.  So we -- we have this

16   information.  The question is, what do we do with this

17   information that's the subject matter of the hearing.

18   So what facts do we need to truly elicit here that go

19   to the testing -- why we need a psychiatric evaluation,

20   if we get to it.  I mean, I frankly don't know really

21   what this witness is going to be able to tell us.  You

22   know, I haven't heard anything so far that we don't

23   largely already know, so I just wanted to move this

24   along.  I think that's really where Ms. Kenny's going.

25               MR. SOUTAR: If the District wants to offer a

K.K. - Direct                          93

1    stipulation that the parent notified Mr. Breiten

2    repeatedly of the emotional issues that A.K. was facing

3    in the district, we can move past this.

4             MS. KENNY: Well, I didn't --

5             THE COURT: Hold on a minute.  As a general

6    statement?  As -- what's the stipulation?  I mean, what

7    -- what -- I mean, what's your intent?  To --

8             MR. SOUTAR: To demonstrate --

9             THE COURT: -- to have the witness tell us

10   every instance that she observed?

11            MR. SOUTAR: Not every one.

12            THE COURT: Every instance that she heard?

13   Well, let's -- let's get a handle on it.  Where's this

14   line of questioning going?  What are you looking to

15   establish?  Maybe we could reach a stipulation on this.

16            MR. SOUTAR: I'm looking to establish that the

17   parent repeatedly told Mr. Breiten, who was his

18   guidance counselor and a member of his 504 team, that

19   he was experiencing emotional issues, that he had

20   anxiety, that he had fear of coming to school, that he

21   had fear of large groups, and they repeatedly --

22            THE COURT: Well --

23            MR. SOUTAR: -- the parents repeatedly told --

24            THE COURT: Well, my understanding that this

25   information was reported by Mom and this information

1   was reported by the child in whatever way it was

2   reported through the inventories and the rating scales

3   that we heard about.  Are you talking about something

4   different than that?

5           MR. SOUTAR: I'm talking about specific

6   incidents.

7           THE COURT: Okay.  So do you want to give us

8   some specific instances to -- as examples of what we

9   already heard that was testified to?

10          MR. SOUTAR: That's --

11          THE COURT: I mean, we have one right now

12  about the clapping out, as it was put.  I mean, how

13  many more instances do you want to share?  And are

14  these going to be the ones that we know directly from

15  the witness or the witness has heard from other people?

16  I'm just trying to get a handle.

17          MR. SOUTAR: They are -- they are examples

18  that the witness conveyed to the District.

19          THE COURT: Okay.  So there are more?  All

20  right.  Well, let's -- let's give this a little bit

21  more time.  You have the time, so let's give it to you.

22  BY MR. SOUTAR:

23      Q    Why don't we make this easy?  Did you ever

24  let the District know -- well, actually, that's already

25  on the record.

K.K. - Direct                                   95

1       `    All right.  Let's fast forward ahead then.

2    You heard testimony about the evaluation planning

3    meeting and there was testimony earlier that, at that

4    meeting, it was agreed that A.K. would receive three

5    evaluations.  Did -- did you ask for other evaluations?

6    A    I don't remember, no.

7        Q    Okay.  Are you aware of other evaluations

8    that you could have asked for?

9    A    No.

10       Q    No.  Was there any reason why you didn't --

11   were there any other reasons why you didn't ask for any

12   additional evaluations?

13   A    Well, when we came to the meeting, actually, we

14   asked the teachers and the child study team to be as

15   supportive as possible to my son's issues and they

16   said, "We're going to do everything possible to support

17   him and we're going to do everything possible to put

18   him in the right environment."  So I just trusted them.

19       Q    Okay.  And are you aware if the District

20   actually did each of the three evaluations they said

21   they would?

22   A    Yes.

23       Q    So this morning, earlier this morning, we

24   heard testimony on an educational evaluation and we

25   heard testimony on the functional psychological

K.K. - Direct                                    96

1    evaluation.  Do you know if there was also a social

2    assessment?

3    A    I think Ms. Rom called me and she asked me

4    questions on the social history of my son.

5         Q    Okay.  Would you please turn to tab three in

6    the joint exhibit binder?

7              THE COURT: It would be the other binder.

8              MR. SOUTAR: We must have all shopped at the

9    same store, Your Honor.

10             THE WITNESS: I got it.

11   BY MR. SOUTAR:

12        Q    And have you seen this social assessment

13   before?

14   A    Yes.

15        Q    And do you understand that this is the social

16   assessment that was completed in connection with A.K.'s

17   testing?

18   A    Right.

19        Q    And did you talk to Ms. Rom before she

20   prepared this report?

21   A    Yes, we talked over the phone.

22        Q    Okay.  And it says in here that A.K. suffers

23   from migraines and has epilepsy.  Do you know how Ms.

24   Rom knew that?

25   A    I told her that.

K.K. - Direct                                97

1          Q    Okay.

2     A    But I have medical records.

3          Q    Okay.  And did you also tell her -- do you

4     know where she learned that A.K. experiences bed

5     wetting at night?

6     A    I told her that, and again, I have medical records

7     on that.

8          Q    Okay.  And do you know where she learned that

9     it seems -- that A.K.'s bed wetting seems worse during

10    the school year in comparison to the summer?

11    A    Yes, and it's also recorded.

12         Q    Okay.  And you also had A.K. evaluated by a

13    neuropsychologist --

14    A    Right.

15         Q    -- correct?

16    A    That was actually suggested by his neurologist.

17         Q    Okay.  And did you give -- did that

18    neuropsychologist prepare a report?

19    A    Yes.

20         Q    And you gave that to the District?

21    A    Yes.

22         Q    Okay.  And is that the report that's

23    referenced here on page two of the social assessment?

24              THE COURT: Page two is actually the page

25    before.

K.K. - Direct                          98

1          THE WITNESS: Right here.

2          THE COURT: Right.

3          THE WITNESS: Yes, I can see Dr. Trobliger's

4     name, yeah.

5     BY MR. SOUTAR:

6          Q    So did there come a point where you disagreed

7     with these evaluations?

8     A    Yes.

9          Q    What did you do?

10    A    Well, then I asked for independent evaluation.

11         Q    Okay.  And how did you ask for the

12    independent evaluation?

13    A    I just wrote an e-mail.

14         Q    Okay.

15    A    I had -- I had Ms. Rom's e-mail since -- I think

16    she asked me to -- if the child study team can use Dr.

17    Trobliger's report.  She asked me via the e-mail, so I

18    said "Yes," and that's how I had her e-mail.

19         Q    Okay.

20    A    So I wrote to her, and again, I copied to Mr.

21    Breiten, that I mentioned so many times, because I

22    thought he is -- he has to know.  He was the one who

23    was involved in A.K.'s social life at that time.

24         Q    Okay.  If you could take a look at tab eight.

25    A    Okay.

K.K. - Direct                                    99

1       Q    And once you've had a chance to read through

2    it, is that the e-mail that you sent asking for

3    independent evaluations?

4    A    That is correct.

5                                    (J-8 Marked for

6                                    Identification)

7       Q    Okay.  And you sent that on or about February

8    27th, 2018?

9    A    Uh huh.

10      Q    And tell me again, how did you get Ms. Rom's

11   e-mail address?

12   A    I have it in my e-mails just because of -- before

13   that, she e-mailed me, asking if the child study team

14   can use Dr. Trobliger's report as a base for the

15   evaluation.

16      Q    Okay.  I'd like to just show you one other

17   document.

18             MR. SOUTAR: I believe this would be R --

19             THE COURT: This would be eight.

20             THE WITNESS: Thank you.

21             MR. SOUTAR: I'm marking that as R-8 for

22   identification.

23                                    (R-8 Marked for

24                                    Identification)

25   BY MR. SOUTAR:

1      Q    My first question is, do you recognize this

2   e-mail?

3   A    Yes, I do.

4      Q    And looking just at the e-mail that was sent

5   on November 7th, 2017 at 11:15, is that the e-mail that

6   you were just describing?

7   A    Uh huh.

8      Q    And this is --

9           THE COURT: I'm sorry.  You have to say "Yes"

10   or "No."

11           THE WITNESS: Yes.

12           THE COURT: Okay.

13   BY MR. SOUTAR:

14      Q    Let move on.  And so, did you receive -- I'm

15   sorry.  I'm going to -- let's go back to your e-mail

16   now, joint exhibit eight, in which you were asking for

17   the independent evaluations.

18   A    Yes.

19      Q    And did you receive any response to this e-

20   mail?

21   A    I received a letter stating I'm not supposed to

22   communicate the Board via the e-mail.

23      Q    Okay.  Were you aware of that before?

24   A    No, never ever.  Nobody ever told me that.

25      Q    Okay.  And so what did you do after you

K.K. - Direct                          101

1    received that letter?

2    A    I wrote a letter, just as I was told.

3         Q    Okay.  Would you please turn to joint exhibit

4    nine?

5    A    Yes.

6         Q    And is that a copy of your letter?

7    A    Yes, it is.

8                                    (J-9 Marked for

9                                    Identification)

10        Q    So we've had a lot of testimony about what

11   happened at the evaluation planning meeting going

12   forward.  Did A.K. ever receive a psychiatric

13   evaluation?

14   A    No.

15        Q    No.  Does A.K. still attend the Parsippany-

16   Troy Hills Schools?

17   A    No.

18        Q    Why not?

19   A    Because after the first months into the Central

20   Middle School, he started developing severe issues and

21   he refused to go to school.  He basically was lying

22   down right there on the floor and he said, "I'm not

23   going anywhere."  He was crying, he was going into the

24   fits, and I probably should have recorded it.  I never

25   do that, unfortunately.  But he said, "I'm not going."

1    So I let him stay home one day and then another day,

2    but he said, "I will never go there again" and he was

3    crying, he was throwing things, he was in distress.  I

4    never saw my child in that kind of a distress.  And

5    then I said I have to do something about it, so I put

6    him in a private school, a very small private school.

7              MR. SOUTAR: Thank you.  Nothing further.

8              THE COURT: When was this that you placed your

9    child in the private school?  I missed the time.

10             THE WITNESS: I believe that was October of

11   2018.

12             THE COURT: All right.  Thank you.

13             Any cross?

14             MS. KENNY: No, Your Honor.

15             THE COURT: Okay.  Anything further?

16             MR. SOUTAR: Just a point of order, Your

17   Honor.  I'd like to move R-1 into evidence.  I don't

18   believe I did that on my direct.

19             THE COURT: Any objection to R-1 going into

20   evidence?

21             MS. KENNY: We just don't think it's relevant

22   to request almost -- more than two years later.

23             THE COURT: Okay.  Right.  I'll -- I'll allow

24   it simply because we did discuss it, for the sake of

25   completeness.

1                          (R-1 Marked for

2                          Identification)

3              And those would be the only -- that's the --

4              MR. SOUTAR: And -- excuse me, Your Honor --

5       R-7 and R-8.

6              MS. KENNY: Your Honor, I -- what was R-7?

7       I'm sorry.

8              MR. SOUTAR: R-7 was --

9              THE COURT: The attendance.

10             MR. SOUTAR: -- the attendance records.

11             MS. KENNY: Oh, I have no objection to R-7.

12             THE COURT: And R-8?

13             MS. KENNY: I object to R-8.  It was not

14      disclosed in advance.

15             MR. SOUTAR: Your Honor, R-8 is from student

16      records that the District provided to me just last

17      Friday.

18             MS. KENNY: I do not recall ever seeing this

19      e-mail before, Your Honor.

20             THE COURT: I mean, the -- it's just "I would

21      like to give permission to the child study team to use

22      A.K.'s last psychological report that was done by Dr.

23      Robert Trobliger on April 2017.  I am also sending

24      parent rating scales that I have completed with A.K.

25      tomorrow.  Thank you, K.K."  I mean --

K.K. - Cross / Redirect                    104

1          MS. KENNY: If it's coming in, I have one

2     quick redirect (sic) then, Your Honor.

3          THE COURT: Okay.  Then ask away.

4          MS. KENNY: Okay.

5     CROSS EXAMINATION BY MS. KENNY:

6          Q    Ms. K., you testified that you had Ms. Rom's

7     e-mail because she e-mailed you, correct?

8     A    Uh huh.

9          Q    But looking at this -- I believe it's R-8 --

10    there's -- the e-mail is not from Ms. Rom.  It's you e-

11    mailing Ms. Rom.  Is that correct?

12    A    I e-mailed to her, right, but it's sitting in my

13    mailbox because I had that e-mail coming from her.

14         Q    But -- but this physical document does not

15    indicate that Ms. Rom e-mailed you.  Is that correct?

16    Do you need a copy?

17    A    No, I actually have it in my -- I have it in my --

18         Q    I understand that, but that was not my

19    question.

20    A    Okay.  Yeah, from this document, yes, absolutely.

21         MS. KENNY: No further questions, Your Honor.

22         THE COURT: Okay.

23         MR. SOUTAR: And just briefly --

24    REDIRECT EXAMINATION BY MR. SOUTAR:

25         Q    Why did you send that e-mail?

K.K. - Redirect / Colloquy                105

1   A    Because I was asked to give her permission to use

2   Dr. Trobliger's report.

3        Q    And asked by whom?

4   A    By Ms. Rom.

5        Q    And how did you get Ms. Rom's e-mail address?

6            MS. KENNY: Objection, Your Honor.  Asked and

7   answered.

8            THE COURT: Well, I think we've heard it now

9   both ways, so which way is it?

10  BY MR. SOUTAR:

11       Q    How did you get Ms. Rom's e-mail address?

12  A    I believe she e-mailed to me, asking for that.

13           THE COURT: All right.  I'll sort it out.

14           Anything else?

15           MR. SOUTAR: Nothing further, Your Honor.

16           THE COURT: Okay, let's go off the record for

17  a minute.

18                    (BRIEF RECESS)

19           THE COURT: Back on the record after some

20  housekeeping.  So to summarize, we -- all of the joint

21  exhibits, one through ten, are in.  There is one P

22  exhibit, P-1, that is in.  And of the R exhibits, R-1,

23  7 and 8 are in.

24                                    (J-1 through J-10,

25                                    R-7, R-8 Entered

Colloquy                                    106

1                                       into Evidence)

2               Do I have that right?

3               MR. SOUTAR: Yes, Your Honor.

4               THE COURT: Okay, great.  All right.  So those

5      are all the documents admitted into evidence.

6               As far as post-hearing briefs, summations,

7      closing, we will have that be submitted simultaneously

8      from a certain amount of time upon receipt of the

9      transcript and I'll let the two of you decide what

10     works for the two of you and I'm fine with whatever you

11     come up with.

12              MR. SOUTAR: Thank you very much, Your Honor.

13              THE COURT: Great.  And we'll close the record

14     for the day.

15          {Whereupon, the proceedings were adjourned.}

16                          * * * * *

17

18

19

20

21

22

23

24

25

107

1    STATE OF NEW JERSEY }

2    COUNTY OF   }

3

4         I, Peggy Wasco, assigned transcriber, do

5    hereby affirm that the foregoing is a true and accurate

6    transcript of the proceedings in the matter of

7    Parsippany-Troy Hills Board of Ed vs. K.K. and A.K. on

8    behalf of A.K., bearing Docket No. EDS 05268-18, heard

9    on May 1, 2019 before the Office of Administrative Law

10   Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D



Kim Rom <krom@pthsd.net>

---

Redacted **'s Individual Evaluation**

1 message

---

Redacted                        Tue, Feb 27, 2018 at 10:08 PM
To: krom@pthsd.k12.nj.us
Cc: rbreiten@pthsd.k12.nj.us

Dear Mrs. Rom,


I am writing to discuss Redacte placement. As 5th grade gradually going to it's graduation I can't stop thinking how challenging it will be for Redac to go to a mainstream 6th grade program. I really think he needs to be in a therapeutic program. I am not sure which program exactly. Maybe an independent evaluation would help shine some light on the questions. I do disagree with some parts of the last evaluations, so I'm asking for an independent. In particular, I'd like a second opinion on his educational, psychological, and psychiatric status. Perhaps we can discuss this at the meeting.


I'm available next week on (March 5th - March 9th from 9 am to 3 pm and all week of March 26th on the same times). I'm terrible at taking notes, so I expect I'll record the meeting. Even if it can't happen in the next three weeks, I think it's important that all the key players are present for this meeting. I'm thinking about Redacte long-term future, and I want to be careful to cover all the bases.


Thanks very much for all your help.


Sincerely,

KRedac KRe